UTILITY CONSULTING SERVICES, INC., demandante y recurrida, *v.* MUNICIPIO DE SAN JUAN y DR. HERNÁN PADILLA, demandados y recurrentes.

*Números:* R-83-51, R-83-52    *Resueltos:* 14 de febrero de 1984

*Maritza Pagán*, abogada de los recurrentes; *José Julián Álvarez y Ramón Maurás Valentín*, abogados de la recurrida.

### SENTENCIA

El Municipio de San Juan contrató los servicios de consultoría de la corporación Utility Consulting Services, Inc. para que analizara las tarifas y facturas en los contratos de suministro de agua y electricidad, y revisara (*audit*, dice el texto en inglés) facturas ya pagadas, para ilustrar al municipio sobre la manera de reclamar sobrepagos. Se pactó que la firma consultora percibiría por estos servicios el 50% de todas las economías resultantes de su gestión, computado sobre un periodo de tres años desde que se hiciera el rea-

juste; y el 50% de rembolsos y créditos que obtuviera el gobierno de la ciudad. Se fijó el término contractual en tres años, a partir del 2 de julio de 1973, sujeto a prórroga por tiempo indefinido hasta que cualquiera de las partes notificara su cancelación con 120 días de antelación. Esta notificación se cursó por el Alcalde, Dr. Hernán Padilla el 18 de abril de 1978. Durante la vigencia del contrato el Municipio pagó a dicha consultora $232,138.62. Después del 3 de octubre de 1977 el municipio no hizo más pagos y la Utility Consulting lo demandó en cobro de servicios en abril de 1980. El pleito fue a juicio y la sala de instancia, al aplicar la fórmula de 50% acordada en el contrato de consultoría, condenó al municipio a pagar $2,516,905.48, suma que resulta en exceso aun de los ajustes o créditos por $2,404,101.38 en que se benefició la Ciudad de San Juan. Expedimos auto de revisión a solicitud del municipio, y considerados los extensos alegatos de ambas partes, resolvemos.

## I

Es de alto relieve la desproporción exorbitante entre las prestaciones de las partes contratantes, que conduce al derrumbe del contrato por aniquilamiento del equilibrio de esas mutuas prestaciones. Por una labor simple y esporádica que en ocasiones se reducía a limpiar la ventana de un contador olvidado y descubrir que el *ratio* (coeficiente) de tarifa era de 700 y no de 7,000 como se venía facturando; por el empleo de tiempo mínimo y horas no especificadas, la recurrida invoca el contrato[1] para justificar su acreencia sobre fondos públicos de $2,749,044.10 generados en su mayor parte durante los *tres años siguientes* a su intervención.

La arraigada tradición de la autonomía de la voluntad (*pacta sunt servanda*), eje de la seguridad jurídica, permite

---

[1] Por estos servicios, *Utility Consulting* recibiría el 50% de la reducción en facturas de luz y agua *durante los tres años siguientes* a su modificación, ajuste o corrección; y créditos atribuibles a la gestión del consultor.

frenar su predominio absoluto cuando la excesiva onerosidad alcance dimensiones de mala fe. *Cf. López de Victoria* v. *Rodríguez*, 113 D.P.R. 265 (1982). Así lo tiene ordenado el Código Civil en su Art. 1210 (31 L.P.R.A. sec. 3375) al declarar que los contratos obligan a todas las consecuencias, que según su naturaleza sean conformes a la *buena fe*, al uso y a la ley.

En casos apropiados, no habrá de llegarse a la aniquilación de la libertad contractual, recurriendo a la alternativa de *revisabilidad* del contrato, un concepto intermedio situado entre los dos polos de la validez y de la nulidad, cuyo núcleo es la sustitución parcial de la voluntad privada por la voluntad estatal y que preserva la eficacia esencial del negocio. M. Royo Martínez, *Transformación del concepto del contrato en el derecho moderno*, 177 Rev. Gen. Legis. Juris. 113-157 y ss. (1945). F. Puig Peña, *Compendio de Derecho Civil Español*, 3ra ed., Madrid, Eds. Pirámide, 1976, T. 3, pág. 338 y ss.

Hay facultad en los tribunales para atemperar la irracionalidad de la causa cuando ésta hiere el principio de la reciprocidad de las prestaciones y la norma de buena fe del citado Art. 1210.

> Atenta nuestra legislación civil al problema de la autonomía de la voluntad, que requiere el cumplimiento de lo pactado en los propios términos convenidos, admite, sin embargo, ciertas restricciones por razón de la buena fe que preside la contratación —arts. 1.258 del C. C. y 57 del de Comercio— y más concretamente, por razón del elemento de justicia objetiva implícito en la exigencia de causa en los contratos, referida esencialmente en los onerosos a la reciprocidad o equivalencia de las prestaciones, pronunciándose nuestra moderna legislación con caracteres más acusados de posibilidad de moderación de lo convenido, siendo preciso reconocer la facultad judicial de modificar el contrato, si bien solo con gran cautela y notoria justificación se podrá hacer uso de la citada facultad modificadora. (S. de 13 de junio de 1944.) F. Bonet Ramón, *Código Civil Comentado*, Madrid, Ed. Aguilar, 1962, pág. 959.

La revisión judicial del contrato en discusión es factible porque 1) era imprevisible el desarrollo que sobrevino en torno a la igualdad de valor, en principio, de prestación y contraprestación (equivalencia); 2) la ejecución del contrato resulta extremadamente onerosa y constituye para el deudor una lesión que no guarda proporción con la ventaja prevista para él en el contrato; y 3) el contrato no tiene carácter aleatorio o de pura especulación, con el que las partes quisieran prever en cierto modo la alteración inusitada del equilibrio entre prestaciones. J. Castán Tobeñas, *Derecho civil español, común y foral*, 10ma ed. rev., Madrid, Ed. Reus, 1967, T. 3, pág. 486. *Cf. Casera Foods, Inc.* v. *E.L.A.*, 108 D.P.R. 850, 856 (1979).

Se cumple nuestra guardada intervención al revocar la sentencia, sin estimar la reconvención en que el municipio solicita restitución de los $232,138.62 ya pagados.

## II

Al promover acción contra el Municipio de San Juan en cobro de servicios bajo contrato de consultoría, la corporación demandante incluyó como demandado en su carácter personal al Dr. Hernán Padilla, Alcalde de la Ciudad, de quien reclamó (aparte de la acción contractual) $250,000 de daños y perjuicios por su resistencia y negativa temeraria a pagar los alegados servicios de la demandante. Contestó el Alcalde la demanda y llegado el pleito a vista en sus méritos, luego de presentarse la prueba de la demandante, solicitó desestimación por insuficiencia de ésta, a cuya petición se allanó la demandante para expresar que desistía de la acción personal contra el Alcalde. El Tribunal Superior no proveyó al desistimiento hasta sometido el pleito en su totalidad, cuando en su sentencia del 10 de noviembre de 1982 expresó: "En cuanto al co-demandado Dr. Hernán Padilla nada se dispone en esta Sentencia por haber desistido la parte demandante con perjuicio de esa causa de acción durante el proceso y haber sido aceptada la misma [*sic*] por el Tribu-

nal." Recurrió en revisión este demandado y señala como error único no haber el tribunal impuesto a la recurrida el pago de costas y honorarios de abogado. Expedimos auto de revisión el 10 de marzo de 1983 y el recurrente sometió su recurso por la argumentación de su solicitud, sin que la parte recurrida haya rebatido la misma.

La imposición de costas es mandatoria, Regla 44.1 de Proc. Civil; y nos parece que mantener una persona sometida a un pleito por tres años y al final desistir —sin más explicación— frente a moción para desestimar por insuficiencia de prueba, acusa una conducta procesal temeraria y abusiva que lastima y subvierte la libertad de acceso a los tribunales en busca de remedio. Regla 44.1(d) de Proc. Civil; *Cf. Kane* v. *República de Cuba,* 90 D.P.R. 428 (1964).

Se revocan las sentencias revisadas y se desestima la demanda, con costas a la demandante. La sala de instancia fijará, además, los honorarios de abogado que corresponden al señor Alcalde en la acción personal desistida.

Así lo pronunció y manda el Tribunal y certifica la Secretaria General. El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Negrón García se inhibieron. El Juez Asociado Señor Rebollo López disintió con opinión.

(*Fdo.*) Lady Alfonso de Cumpiano
*Secretaria General*

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

En el voto disidente que emitiéramos en el caso de *Vda. de Zayas* v. *Pepsi Cola,* 114 D.P.R. 772, 774 (1983), expresamos que "ser consistentes no es garantía de que resolvemos correctamente, pero, por lo menos, representa en nuestra función de impartir justicia tranquilidad de espíritu".

La consistencia en nuestras decisiones fomenta la excelencia en la práctica de la profesión por cuanto permite a los

abogados poder evaluar las situaciones de hecho ante su consideración en su justa perspectiva y, en su consecuencia, les facilita aconsejar adecuada e inteligentemente a sus clientes sobre las distintas opciones que a éstos les asisten. De igual importancia lo es el hecho de que tiende a evitar la incertidumbre en nuestros jueces de instancia al enfrentarse a los casos que vienen obligados a resolver. El que seamos consistentes, en resumen, es de fundamental importancia por cuanto ello promueve en nuestra jurisdicción *"la seguridad jurídica,* cuya uniformidad es eje de la ley". *Jack's Beach Resort, Inc.* v. *Cía. Turismo,* 112 D.P.R. 344, 350 (1982).

Ello, naturalmente, no implica que este Tribunal, ni ningún otro, esté atado inflexible e inexorablemente a lo resuelto en el pasado. El derecho es dinámico y, por lo tanto, evoluciona constantemente; el mismo, sin embargo, no cambia súbita y radicalmente de día a día y de semana en semana.

I

En *López de Victoria* v. *Rodríguez,* 113 D.P.R. 265 (1982), (¹) tuvimos la oportunidad de expresarnos respecto a un contrato *contingente* de servicios profesionales otorgado entre un abogado y su cliente, referente el mismo a un pleito de divorcio y de liquidación de gananciales. Mediante la sentencia emitida sostuvimos aquella que dictara *sumariamente* el tribunal de instancia al declarar con lugar la demanda en cobro de dinero radicada por el abogado y condenar, en su consecuencia, al cliente al pago total de los honorarios pactados.

Manifestamos en el citado caso, *López de Victoria,* supra, págs. 268 y 271, que a pesar de que el "contrato de servicios profesionales de abogado está *saturado* de un *elemento ético* que le *diferencia substancialmente* del convenio común sobre

---

(¹) Sentencia de fecha 29 de junio de 1982, la publicación de la cual fue ordenada por este Tribunal.

arrendamiento de servicios", —por lo que ha de ser examinado el mismo con mayor rigurosidad que un contrato de servicios común y corriente— "no es éste el caso que requiera la intervención moderadora del tribunal con la *autonomía contractual* de las partes que se da únicamente en *circunstancias extraordinarias,* facultad dimanante del citado Art. 1210 Cc *que ha de ejercerse con extrema cautela y patente justificación por su efecto lesivo a la estabilidad de los contratos y a la seguridad jurídica".* (Énfasis suplido y escolio omitido.)

Mediante opinión de 21 de octubre de 1983 en el caso de *Plan Bienestar Salud* v. *Alcalde Cabo Rojo,* 114 D.P.R. 697, 699 y 702 (1983) —caso en que el Alcalde de Cabo Rojo se había comprometido a pagar, mediante orden administrativa al efecto, una cantidad de dinero en específico como aportación patronal a un Plan de Bienestar de Salud en beneficio de los empleados de la limpieza de dicho municipio y en que, a pesar de que el referido plan prestó los servicios requeridos, el alcalde se negó a satisfacer por entero la cuota patronal y al ser demandado por el referido Plan de Bienestar en cobro de dinero el alcalde alegó que no tenía que hacerlo así por razón de que la orden administrativa constituía un acto nulo y *ultra vires* de su parte— este Tribunal, al revocar la sentencia dictada por el tribunal de instancia que había declarado sin lugar sumariamente la demanda radicada, expresó:

> Independientemente de la naturaleza jurídica del municipio en Puerto Rico, *resulta claro que las obligaciones que contraiga se rigen por principios de derecho civil, sujeto a estatutos que modifiquen tal situación.*
>
> *Los contratos administrativos se rigen normalmente, en ausencia de régimen especial, por la teoría general de los contratos . . . . Ello significa que la doctrina del enriquecimiento injusto,* entre otras, *es aplicable a determinadas situaciones en que una de las partes contratantes es un organismo público.*
>
> .  .  .  .  .  .  .  .  .  .
>
> Aun suponiendo, no obstante, que el acuerdo logrado sea anulable o aun nulo por razón de no haberse observado determi-

nadas formalidades de ley, *ofende elementales principios de equidad, en el sentido civilista de la palabra, el que un municipio pueda beneficiarse de un acuerdo en las circunstancias específicas de este caso y a la vez evadir toda responsabilidad respecto a lo convenido libremente por él.* (Énfasis suplido.)

En *Colondres Vélez* v. *Bayrón Vélez*, 114 D.P.R. 833 (1983) —caso en que el Municipio de Maricao se negaba a cumplir con un contrato de compraventa que había otorgado, mediante el cual había readquirido en el 1980 un solar, y edificio, por la suma de $35,000, la nuda propiedad del cual dos años antes el propio municipio le había vendido a la otra parte por la suma de $800— citando como único fundamento las disposiciones del *Art. 1210* del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3375,[2] confirmamos la sentencia dictada por el tribunal de instancia, la cual había decretado la validez y obligatoriedad del contrato celebrado.

En el presente caso, la corporación demandante otorgó un contrato de servicios con el Municipio de San Juan —contrato que fue preparado por el propio asesor legal del referido municipio y firmado por su alcalde— mediante el cual éste se obligó a pagar a la aquí demandante el cincuenta (50) por ciento del monto total del dinero que se economizara el municipio durante el término de vigencia del contrato, por concepto de economías o créditos de que fuera beneficiario, en relación con el consumo de energía eléctrica en todas sus facilidades.

Es un hecho incontrovertido que el Municipio de San Juan, como consecuencia directa o indirecta del trabajo realizado y el asesoramiento brindado por la corporación demandante,[3] recibió créditos o se economizó en exceso de la suma de cinco millones de dólares.[4]

---

[2] "Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza, sean conformes a la buena fe, al uso, y a la ley."

[3] Trabajo que no fue tan sencillo como indica el tribunal en la parte núm. 1 de la sentencia emitida.

[4] Exactamente la suma de $5,033,810.96.

El referido municipio comenzó a pagar y luego se negó a honrar el contrato que *libremente* había otorgado, con la alegación de que el mismo era nulo. El tribunal de instancia, mediante una bien razonada sentencia y a la luz de las cláusulas contenidas en el contrato celebrado, condenó al referido municipio a pagar a la parte demandante la mitad de la suma de dinero que la corporación demandante le había economizado.

Utilizando como fundamento, erróneamente, a nuestro juicio,[5] las disposiciones del citado Art. 1210 del Código

---

[5] J. M. Manresa, *Comentarios al Código Civil Español*, 6ta. ed. rev., Madrid, Ed. Reus, 1967, T. VIII, Vol. 2, págs. 437–440, comentando el Art. 1.258 del Código Civil Español (*Art. 1210 de nuestro Código*) expresa:

"III. *Extensión y fuerza obligatoria de lo convenido.—La fuerza de obligar que los contratos llevan en sí, aparece proclamada una vez más en este artículo,* determinando concretamente el instante en que empieza, referido al consentimiento que determina la perfección y alcance que tiene, no limitado a lo que expresamente se pacte.

"*Debe entenderse la buena fe, tomando la frase en sentido objetivo, en dar al contrato cumplida efectividad en orden a la realización del fin propuesto, por lo que han de estimarse comprendidas en las estipulaciones contractuales, aquellas obligaciones que constituyen su lógico y necesario cumplimiento.* (S. 9 diciembre 1963.)

"*El artículo 1.258, que obliga al cumplimiento, no sólo de lo expresamente pactado, sino a todas las consecuencia[s] que se deriven, junto a la buena fe y la ley, del uso al que el precepto interpretativo parece asimilar lo que se llama 'costumbres de la tierra'; bien mirado, es una norma que más que la exégesis del contrato, tiende a contemplar el mismo extendiéndolo a todo aquello que por ser práctica observada, reiterada y admitida, se cree innecesario consignar expresamente en el texto contractual, tratándose por lo común, de materia accesoria . . . .*" (Énfasis suplido.)

Q. Scaevola, por su parte, *Código Civil*, 2da ed., Madrid, Ed. Reus, 1958, T. XX, págs. 634–635, expresa al respecto que:

"Si el contrato es la manifestación de la voluntad de las partes acerca del objeto de él, *vendrán rigorosamente sujetas al cumplimiento de lo que de modo expreso pactaron.* Precisamente por eso y para eso estipularon, y por algo y para algo acordaron en darse una cosa o prestarse un servicio. *Pacta sunt servanda:* 'los pactos deben cumplirse según fueron otorgados', y 'cada uno debe cumplir aquello a que se obligó por su propio consentimiento'.

"*En esto no hay duda, aparte de la interpretación del contrato, aquello a que me comprometí, aquello que yo pacté, vengo sujeto a cumplirlo.*

"*Lo pactado es propiamente el área del contrato, la cual, por accesión, se extiende y amplía. El Código español, a semejanza de otros extranjeros* (Francia,

Civil y apartándose de la norma establecida en el caso de *López de Victoria* v. *Rodríguez*, ante, pág. 271, a los efectos de que "la intervención moderadora del tribunal con la autonomía contractual de las partes" ha de ser ejercida "únicamente en circunstancias extraordinarias", y "con extrema cautela y patente justificación", este Tribunal revoca dicha decisión con lo que lesiona, a nuestra manera de ver las cosas, "la estabilidad de los contratos y la seguridad jurídica" en nuestra jurisdicción.

## II

En adición a lo expresado en el reciente caso de *Plan Bienestar Salud* v. *Alcalde Cabo Rojo*, ante, pág. 699, a los efectos de que las obligaciones que contrae un municipio "se rigen por principios de derecho civil" y de que los contratos administrativos se rigen normalmente "por la teoría general de los contratos", está plenamente establecido en esta jurisdicción que un contrato entre "el gobierno" y un ciudadano particular debe interpretarse como si se tratara de un contrato entre dos personas particulares. *Rodríguez* v. *Municipio*, 75 D.P.R. 479 (1953); *Zequeira* v. *CRUV*, 83 D.P.R. 878 (1961); Opiniones Secretario de Justicia, Núm. 1972-17, Núm. 1977-11 y Núm. 1978-15. Resulta meridianamente claro, por lo tanto, que las obligaciones que contrajo el Municipio de San Juan con la parte demandante mediante el contrato aquí en controversia, deben ser examinadas a la luz de los principios de derecho civil, específicamente, de la teoría general de los contratos.

En su consecuencia cobran importancia, en relación con los hechos de este caso, disposiciones de nuestro Código Civil

---

art. 1.135; Italia, 1.124; Méjico, 1.276), *prolonga la acción del contrato a 'todas las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley'.* Es decir, rigen, imperan, obligan las consecuencias a que se refiere el artículo, aun sin mención expresa de ellas, en un contrato *dado*. La regla jurídica es imperativa; manda y ordena, sancionando la efectividad de cuanto emane del contrato." (Énfasis suplido.)

tales como las del Art. 1207, (⁶) *el cual consagra el principio de la autonomía de la voluntad* al señalar que los "contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por coveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público"; (⁷) las del Art. 1230, (⁸) mediante el cual se persigue mantener el ejercicio de esta libertad contractual separada de los requisitos de forma, a los efectos de que los "contratos serán obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez"; y las disposiciones, por último, del Art. 1208 (⁹) a los efectos de que la "validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contrantes".

Sobre *la libertad de contratación* ha sido mucho lo que se ha escrito. Nos señala Puig Brutau, en lo pertinente, que esta autonomía "significa que, en principio, todo particular puede contratar cuando quiera, como quiera y con quien quiera".(¹⁰) Nos dice Manresa que producto "el contrato de la libre y acorde voluntad de los interesados para crear una relación jurídica especial, ha de regirse ésta con preferencia, según ya indicamos, por lo que quisieron y convinieron aquellos a quienes liga". (¹¹) Expresa, a estos mismos efectos, Diego Espín Cánovas que una "de las tradicionales características del Derecho de obligaciones es la de la amplitud con que las partes pueden crear y regular sus propios intereses,

---

(⁶) 31 L.P.R.A. sec. 3372.

(⁷) Sobre este punto en particular, véanse: *Borges* v. *Registrador*, 91 D.P.R. 112 (1964); *Castle Enterprises, Inc.* v. *Registrador*, 87 D.P.R. 775 (1963); *Clausells* v. *Commercial Union A. Co.*, 37 D.P.R. 117 (1927); *Tastee Freez* v. *Negdo. Seg. Empleo*, 108 D.P.R. 495 (1979).

(⁸) 31 L.P.R.A. sec. 3451.

(⁹) 31 L.P.R.A. sec. 3373.

(¹⁰) J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1978, T. 2, Vol. I, pág. 5.

(¹¹) J. M. Manresa, *op. cit.*, pág. 380.

valiéndose para ello de la figura del contrato, que se convierte así en molde jurídico capaz de recoger cualquier contenido económico . . .".([12])

En relación, en específico, con contratos celebrados entre un municipio y una persona particular es de suma importancia señalar que una vez se perfecciona el mismo es de aplicación la doctrina general de la inalterabilidad de los contratos; o sea, aplica la máxima *pacta sunt servanda*. A esos efectos expresa el comentarista V. Balbín Pechuán en su obra *Los Contratos Municipales,* que:

> El contrato administrativo, una vez que se perfecciona por la adjudicación definitiva, tiene que ejecutarse y debe cumplirse no de cualquier forma, sino con arreglo a lo convenido por las partes contratantes, es decir, de acuerdo a lo pactado, que es lo que significa el principio básico *pacta sunt servanda.* Este mantenimiento de lo pactado y este cumplimiento de lo convenido en el contrato interesa no sólo a las partes contratantes, sino que interesa a la paz social. Constantemente estamos contratando, pues la mayor parte de los actos humanos son contratos de una y otra naturaleza, *de aquí que si no se cumpliesen o pudieran libremente no cumplirse los contratos, se produciría un verdadero "caos" en la sociedad.*([13]) (Énfasis suplido.)

### III

El principio de la autonomía de la voluntad está sujeto, naturalmente, a que lo pactado libremente por las partes no sea contrario a las leyes, a la moral, ni al orden público. El contrato aquí en controversia claramente no lo es. Como bien señala la parte demandante, este Tribunal en sus interpretaciones del término "orden público" consistentemente ha buscado su expresión *en la ley*. A esos efectos, véanse: *Asoc. de Condóminos* v. *Seguros Arana,* 106 D.P.R. 133 (1977); *Asoc. de*

---

([12]) D. Espín Cánovas, *Manual de Derecho Civil Español,* 4ta ed., Madrid, Ed. Rev. Der. Privado, 1975, Vol. III, págs. 355–356.

([13]) V. Balbín Pechuán, *Los Contratos Municipales,* Madrid, Ed. Civitas, 1976, pág. 125.

*Condóminos* v. *Centro I, Inc.*, 106 D.P.R. 185 (1977); *Hernández* v. *Méndez & Assoc. Dev. Corp.*, 105 D.P.R. 149 (1976).

A esos efectos, el tratadista Scaevola expresa que:

El concepto "orden público", en sí, aislado, con separación de la idea de ley, parécenos carece de efectividad en el campo propio de la contratación. Aun es dable hablar de moral como cosa independiente del derecho; no se concibe, en cambio, el orden público, esto es, ordenamiento de la vida social, sin un conjunto de reglas que lo determinen. Es precisamente orden público, porque el legislador lo declara así, o, aun sin declararlo expresamente, lo es, en cuanto lo legislado afecta al interés general. *El orden público fuera de la ley, es el vacío, no existe.*

En definitiva: *pactos contra el orden público hay que entender los que van contra ley,* sea propia y estrictamente y en su totalidad de derecho público, sea de derecho privado, pero afectante en determinados preceptos al interés social.[14] (Énfasis suplido.)

C. Antieau, en su obra *1A Municipal Corporation Law,* New York, Ed. Matthew Bender, 1980, Sec. 10.15, pág. 10-43, enumera situaciones en las cuales los contratos municipales han sido invalidados por contravenir el "orden público". Entre otras, señala: a) duración excesiva del contrato más allá del término de las autoridades municipales; b) limitación irrazonable de los poderes de los funcionarios sucesores; c) renuncia o indebida delegación de los poderes gubernamentales; d) conflicto de intereses de los funcionarios municipales envueltos. No hemos encontrado ni un solo caso, ni ningún autor, que sostenga como contrario al "orden público" un contrato, como el de autos, en donde se pactan unos *honorarios contingentes* por unos servicios profesionales a prestarse.

¿Qué de ilegal e inmoral puede tener un contrato cuyo

---

[14] Q. Scaevola, *Código Civil*, 2da ed., Madrid, Ed. Reus, 1958, T. 20, págs. 586–587.

objetivo es la reducción en forma legítima de los gastos de operación en que incurre un municipio? ¿Acaso no es la reducción de los gastos energéticos en el gobierno una buena y deseable política pública?

¿Qué de ilegal e inmoral puede tener un contrato cuando está pactado expresamente en el mismo que el derecho, y la cuantía, a cobrar a una parte depende directamente de cuán beneficiosas resulten para el municipio las gestiones lícitas a ser realizadas por la primera?

Nos parece que no puede ser otra la conclusión de que en el caso presente no existe fundamento legal alguno para anular el contrato en controversia por razón de que el mismo contravenga la ley, la moral o el orden público. Distinta sería la situación si se hubiere demostrado que medió fraude o manejos turbios en la contratación efectuada;[15] eventos que en el presente caso ni tan siquiera fueron alegados por el Municipio de San Juan al contestar la demanda.

El contrato celebrado, por último, tampoco resulta ser uno *ultra vires*. Debemos comenzar por señalar que, como regla general y específicamente en lo referente a gobiernos municipales, un contrato otorgado entre un municipio y una persona particular es *ultra vires*, únicamente, *si no cae dentro de los poderes municipales bajo ninguna circunstancia o para ningún propósito*. C. Antieau en su obra *Municipal Corporation Law, op. cit.*, Sec. 10.13, pág. 10-34, nos señala, en lo pertinente, que "[u]ltra vires contracts are those completely beyond the competence of local governments in all circumstances". En E. McQuillian, *The Law of Municipal Corporations*[16] se expresa, en lo pertinente, que:

The term "ultra vires" has been employed to mean many different things. Thus, it is not uncommon to refer to contracts

---

[15] Correspondiéndole el peso de la prueba respecto a ello, dicho sea de paso, al municipio demandado. *Serrano* v. *Torres*, 61 D.P.R. 162 (1942).

[16] 10 McQuillian, *Municipal Corporations*, 3ra ed., Illinois, Callaghan & Co., 1981, Sec. 29.10, pág. 236.

as ultra vires where made by the wrong municipal officer or without the formalities required by law. The improper use of this term has been productive of much confusion and for the purpose of clearly defining the rights and duties of all the parties to a municipal contract, *an ultra vires contract, as the term will be used herein, and according to its strict and true construction, is a contract which it is not within the power of a municipal corporation to make under any circumstances or for any purpose.* (Énfasis suplido y escolios omitidos.)

¿Puede válidamente argumentarse que el Municipio de San Juan no tenía *el poder* para otorgar el contrato aquí en controversia *bajo ninguna circunstancia,* o que dicho contrato *no tenía propósito válido alguno*? Creemos que no.

Como bien señala McQuillian, a la pág. 234 de su obra antes citada, *The Law of Municipal Corporations,* "a city may enter into contracts *in aid* of the performance of its public duties". (Énfasis suplido y escolio omitido.)

## IV

Tenemos, en resumen, que el contrato aquí "aniquilado" por la sentencia que emite el Tribunal no es *ultra vires,* como tampoco es contrario a las leyes, a la moral, ni al orden público. El propósito del mismo es legítimo y beneficioso para el Municipio de San Juan: economizar fondos públicos que eran gastados innecesariamente en consumo de energía eléctrica, fondos que podrán ser utilizados en otras formas en beneficio de los ciudadanos de dicho municipio.

Las consecuencias del referido contrato eran claras y previsibles: la parte demandante tendría derecho, en concepto de honorarios contingentes, a la mitad de lo que sus gestiones y recomendaciones le economizaran al municipio. Dicho contrato fue pactado libremente por las partes; de hecho, como expresáramos anteriormente, el mismo fue preparado por el asesor legal del municipio. Éste definitivamente no era la "parte débil" que vino obligada a aceptar los términos impuestos por la "parte poderosa". [17]

---

[17] Véase: *C. M. & Finance Corp.* v. *Cooley,* 103 D.P.R. 6 (1974).

Somos del criterio que la función de este Tribunal al aquilatar un caso como el de autos no es la de determinar, a posteriori, la "conveniencia" o no de los términos del contrato celebrado o cuáles, de acuerdo con el criterio individual de cada uno de nosotros, han debido ser los mismos. Nuestra función se limita, por mandato de ley, a determinar *la legalidad* del contrato.(18) No estamos llamados a ejercer, respecto a los municipios de Puerto Rico, un poder similar al de *parens patriae* que ejercemos en relación con los menores de edad.

Ante la realidad de lo expuesto, el Tribunal expresa que procede el "aniquilamiento" del contrato celebrado por razón de "la desproporción exorbitante entre las prestaciones de las partes contratantes" en vista de la "labor simple y esporádica" que realizó la corporación demandante. (Sentencia, pág. 89.)

Somos del criterio que, al igual que en el caso de *López de Victoria* v. *Rodríguez*, ante, pág. 271, "no es este el caso que requiera la intervención moderadora del tribunal con la autonomía contractual de las partes".

En primer lugar, y en adición a las circunstancias anteriormente mencionadas que rodearon la otorgación del contrato objeto del presente pleito, no podemos perder de vista el hecho de que, como en todo contrato sobre honorarios contingentes, al momento de otorgarse el contrato aquí en controversia ni una ni otra parte sabía a ciencia cierta cuál iba a ser el fruto o resultado del trabajo a ser realizado por la corporación demandante. Pudo haberse dado el caso de que las economías resultantes para el Municipio de San Juan hubieran podido consistir de una suma de dinero nominal. En tal eventualidad los honorarios que hubieran correspondido a la demandante no sólo no hubieran llamado la atención de persona alguna, sino que en dicha situación la demandante con toda seguridad hubiera perdido dinero al

---

(18) Véase: *Middlesex County Sewer. Auth.* v. *Middlesex Borough*, 181 A.2d 818 (1962).

compararse los exiguos honorarios a que hubiera tenido derecho con las horas y esfuerzo invertidos por ella en el trabajo realizado. *Claro está, ese era el riesgo que bajo el contrato celebrado corría la corporación demandante.*

Resultó, sin embargo, que el trabajo realizado tuvo un éxito probablemente no previsto por persona alguna. Es posible que de momento pueda llamar la atención la magnitud de los honorarios que le corresponden a la demandante. No debemos olvidar, sin embargo, que por cada dólar a que tiene derecho la demandante bajo el contrato celebrado, el Municipio de San Juan se economiza a su vez un dólar. *¡Para el referido municipio sí que no existía riesgo alguno bajo el contrato otorgado!*

En ello es que precisamente consiste la justificación, y hasta cierto punto "el atractivo", de los contratos de honorarios contingentes: el "cliente" no tiene que hacer desembolso alguno de honorarios. El que invierte su tiempo, su esfuerzo y, hasta su dinero, lo es la otra parte, dependiendo los honorarios que pueda ésta percibir en proporción al éxito que tengan sus gestiones y, en su consecuencia, en proporción directa a cuán beneficiado resulta su representado.

Determinar que bajo las circunstancias presentes en el caso que nos ocupa procede la "intervención" del Tribunal y la consecuente "aniquilación" de este tipo de contrato contingente de servicios constituye, a nuestra manera de ver las cosas, un golpe mortal para la "certeza jurídica" que debe existir en nuestra jurisdicción que, inclusive, puede llevarnos al "caos" de que nos habla el comentarista V. Balbín Pechuán en su antes citada obra.

¿Significa la decisión que hoy emite este Tribunal que de ahora en adelante aquel corredor de bienes raíces a quien se le encomendó la venta de una propiedad o aquel abogado a quien se le confió el caso de daños y perjuicios no podrán cobrar de sus respectivos clientes el porcentaje acordado en el contrato celebrado debido a que o vendieron la casa o transigieron el caso con una simple llamada telefónica?

¿Van a depender los honorarios a cobrarse en los contratos contingentes de las horas efectivamente trabajadas o del número de diligencias realizadas? Si se puede descartar de un plumazo el porcentaje libremente pactado por las partes en el contrato que celebran, *¿a base de qué criterios van a valorizar los tribunales de justicia dicha labor? ¿Que guías existen para ello?*

En segundo lugar, tampoco se justifica la "intervención moderadora" del Tribunal con el contrato otorgado por supuestamente existir una "desproporción exorbitante entre las prestaciones de las partes contratantes", por cuanto la labor realizada por la corporación demandante *no* se circunscribió meramente a lo expuesto en la sentencia que se emite. La demandante es una corporación doméstica que se dedica a prestar servicios de asesoramiento en asuntos de energía eléctrica, agua y combustible. Cuenta para ello con personal graduado de ingeniería. A manera de ejemplo y en relación con el trabajo realizado por ellos en beneficio del Municipio de San Juan, el récord demuestra que dicho personal descubrió, entre otras cosas y en relación con una bomba de drenaje propiedad del referido municipio, lo que el personal de éste por años no había descubierto: se pudo comprobar que la facturación se basaba en estimados y que la base de dichos estimados era errónea por cuanto presuponía una utilización constante de energía eléctrica cuando lo cierto era que dicha bomba de drenaje sólo operaba al producirse acumulación de agua en las calles. Este descubrimiento, por sí solo, resultó en una economía para el Municipio de San Juan de $2,431,228.84.[19]

La labor realizada definitivamente no puede haber sido tan "simple y esporádica" como se alega. La prueba de ello es que este Tribunal en la Sentencia que emite concluye que se "cumple nuestra guardada intervención al revocar la sentencia, *sin estimar la reconvención en que el municipio soli-*

---

[19] Véanse las determinaciones de hecho núm. 11, 12, 13 y 14 de la sentencia emitida por el tribunal de instancia.

*cita restitución de los $232,138.62 ya pagados*". (Énfasis suplido.) (Sentencia, pág. 91.) La contradicción es aparente; el propio Tribunal reconoce que lo que califica de "simple y esporádica", en realidad no lo es.

Por último —aun presumiendo a los fines de la argumentación, de que la labor realizada fuera en extremo sencilla— lo cierto es que el trabajo realizado por la corporación demandante le economizó al Municipio de San Juan la suma de $5,033,810.96. La realidad es que el referido municipio, aun después de "pagar" la mitad de dicha suma en concepto de honorarios, se "economiza" exactamente la misma suma de dinero, o sea, $2,516,905.48; fondos que podrán ser utilizados por dicho municipio para realizar obras en beneficio de la ciudadanía de San Juan. ¿Es razonable que el municipio se beneficie así sin tener que pagar lo pactado? En palabras de este Tribunal —en el reciente caso de *Plan Bienestar Salud* v. *Alcalde Cabo Rojo*, ante, págs. 702–703— ¿No "ofende elementales principios de equidad, en el sentido civilista de la palabra, el que un municipio pueda beneficiarse de un acuerdo en las circunstancias específicas de este caso y a la vez evadir toda responsabilidad respecto a lo convenido libremente por él"?

En resumen, disiento en el presente caso por entender que la decisión que hoy emite este Tribunal constituye un viraje que atenta contra la libertad de contratación y, por ende, contra la "seguridad y certeza jurídica" que debe imperar en nuestro país. Confirmaría, en su consecuencia, la sentencia dictada por el tribunal de instancia.