SENTENCIA
El Mundo Broadcasting Corporation (El Mundo o peticionario) acudió oportunamente ante nosotros solicitándonos la revocación de la sentencia dictada por el Tribunal de Apelaciones en el caso de epígrafe.
En su sentencia, el foro apelativo revocó una sentencia dictada sumariamente por el Tribunal de Primera Instancia, donde se desestimó con perjuicio la demanda instada *333 por los recurridos. En su demanda, los recurridos reclamaban daños y perjuicios por un alegado incumplimiento de contrato de arrendamiento por parte de El Mundo. En esencia, los recurridos adujeron que el peticionario actuó de mala fe al momento de renovar el contrato de arrendamiento por no haberles informado que El Mundo había subarrendado la propiedad objeto del contrato y que el canon de subarrendamiento sobrepasaba significativamente los cánones pactados entre ellos y el peticionario.
Por su parte, el peticionario negó toda actuación de mala fe y argüyó que el contrato de arrendamiento no impedía el subarrendamiento, así como tampoco exigía que se informara qué canon se cobraba por subarrendar. En su petición de sentencia sumaria indicó que los recurridos habían incurrido en falta de diligencia al momento de la renovación del contrato al no inspeccionar el predio arrendado, lo que hubiera evidenciado que, en efecto, el lugar se había subarrendado.
El Tribunal de Apelaciones revocó al foro primario al resolver que no procedía dictar sentencia sumariamente, ya que se debió haber indagado si hubo una lesión al principio de reciprocidad contractual y a la buena fe. El foro apelativo intermedio dispuso que, además, se debió determinar si de “lo expresamente pactado, la buena fe creó ... unos deberes especiales de conducta exigibles de acuerdo a la naturaleza de la relación jurídica y la finalidad perseguida entre las partes”. Resolución del Tribunal de Apelaciones, pág. 16. En segundo lugar, el foro apelativo determinó que no hubo un descubrimiento de prueba adecuado, por lo que procedía también dejar sin efecto la sentencia del foro primario.
Inconforme con dicha determinación, El Mundo acudió oportunamente ante nosotros y solicitó que se revocara la determinación del foro apelativo. En su recurso ante nosotros planteó la comisión de los errores siguientes:
Erró el Tribunal de Apelaciones al revocar la sentencia dictada *334 por el tribunal de instancia por alegadamente existir controversias de hechos y de derecho.
[D]eterminar que el tribunal de instancia había abusado de su discreci[ó]n al limitar el descubrimiento de prueba. Petición de certiorari, pág. 7.
Expedimos el auto solicitado y ambas partes han comparecido. Luego de evaluar los planteamientos de las partes, se confirma el dictamen del Tribunal de Apelaciones por estar este Tribunal igualmente dividido.
Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente Señor Hernández Denton se inhibió. El Juez Asociado Señor Rebollo López emitió una opinión de conformidad. La Juez Asociada Señora Rodríguez Rodríguez emitió una opinión disidente. La Jueza Asociada Señora Fiol Matta disintió sin opinión escrita. El Juez Asociado Señor Rivera Pérez no intervino.
(.Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

Opinión de conformidad emitida por el
Juez Asociado Señor Rebollo López.
Estamos contestes en que procede decretar la confirmación de la sentencia emitida en el presente caso por el Tribunal de Apelaciones. Diferimos vehementemente de la posición asumida en la opinión disidente, no sólo porque dicha posición resulta ser errónea e injusta, sino porque pretende premiar las actuaciones deshonestas de una parte contratante, las cuales son, a la vez, totalmente contrarias al principio de la buena fe contractual, elemento indispensable en todo proceso de negociación en nuestra jurisdicción.
*335 I
En 1953, los esposos Jorge Ortiz Toro y Rita Brunet Calaf suscribieron un contrato de arrendamiento con El Mundo Broadcasting Corporation (EMB), sobre una finca de su propiedad de aproximadamente cinco cuerdas, ubicada en el Barrio Sonadora de Aguas Buenas, Puerto Rico. El arrendamiento fue pactado por un término de cincuenta años, comenzando a partir del 1 de julio de 1953, con el derecho a ser renovado —una vez transcurriera ese primer término— por un término adicional de cuarenta y nueve años, y por un canon de $150 mensuales.
El 11 de octubre de 1994 —antes del vencimiento del primer término del contrato— los miembros de la Sucesión de Jorge Ortiz Toro y Rita Brunet Calaf ratificaron el contrato de arrendamiento suscrito originalmente por sus padres con EMB. En dicho acto las partes enmendaron el referido contrato, acordando aumentar el canon de arrendamiento a la cantidad de $691.40 mensuales. Acordaron, además, que durante el término de duración del contrato, o durante cualquier período adicional, el canon de arrendamiento mensual aumentaría un diez por ciento anualmente. En la mencionada escritura de ratificación no se hizo constar cláusula alguna que prohibiera a EMB subarrendar el predio objeto del contrato de arrendamiento.
El 15 de noviembre de 2002, EMB ejerció su derecho de renovar el contrato de arrendamiento por un periodo de cuarenta y nueve años. EMB nunca le informó a la Sucesión Ortiz Brunet que había subarrendado, o que estaba en proceso de subarrendar, parte del terreno para colocar otras torres de transmisión. Por otro lado, la referida Sucesión nunca requirió de EMB información al respecto.
El 28 de enero de 2003, luego de que EMB ejerciera su derecho a extender el contrato, la Sucesión Ortiz Brunet le envió una carta indicándole que conocía que en el terreno arrendado existían torres de transmisión que no pertene *336 cían a EMB. Además, por medio de dicha carta solicitaron discutir la cuestión del monto del arrendamiento debido a la existencia de los referidos subarriendos. EMB no contestó esta carta.
Por consiguiente, el 3 de julio de 2003, la Sucesión Ortiz Brunet presentó una demanda contra EMB ante el Tribunal de Primera Instancia, Sala Superior de San Juan. En la referida demanda alegó que durante la renegociación del contrato de arrendamiento en el 1994 y, posteriormente, al ejercer su derecho a extender este contrato en el 2002, EMB ocultó que había subarrendado el terreno, permitiendo la instalación de torres de transmisión radial adicionales a la suya y devengando ingresos de dichos arrendamientos. Alegó la Sucesión que estos ingresos resultaban ser mucho mayores de lo que éstos pagaban como canon de arrendamiento original. El ocultar esta información al momento de renegociar el contrato de arrendamiento constituía, según la Sucesión, una violación al principio de la buena fe contractual. En virtud de ello, la Sucesión solicitó la cancelación del contrato por incumplimiento del mencionado requisito de buena fe. En la alternativa, la Sucesión solicitó que el foro de instancia ordenara la renegociación del canon de arrendamiento y que para ello se tomara en cuenta los cánones de subarrendamiento y otros beneficios que EMB había estado recibiendo por las torres de transmisión instaladas en el referido predio de terreno.
La Sucesión solicitó del foro de instancia que ordenara la realización de un descubrimiento de prueba. Así ordenado, la Sucesión cursó un primer pliego de interrogatorios a EMB. En este interrogatorio, los demandantes inquirieron de EMB sobre cuántas torres de telecomunicaciones habían sido enclavadas en el predio. EMB contestó que sólo dos torres, una construida en 1953 y otra aproximadamente en 1958. Los dueños de las referidas torres eran las Compañías Telemundo y Teleonce, respectivamente. Ade *337 más, en dicho interrogatorio EMB aceptó que el predio arrendado estaba siendo subarrendado por ésta. En un escrito posterior, EMB admitió que en realidad había tres torres de transmisión en el predio.
Posteriormente, y con el permiso del tribunal de instancia,(1) los codemandantes cursaron un segundo pliego de interrogatorios. En éste, la Sucesión solicitó que EMB contestara, por cada subarriendo, el nombre, la dirección y el número de teléfono de la persona a quien se subarrendaba, el canon de subarrendamiento desde su inicio al presente, y la copia de los contratos de subarrendamiento. Solicitaron, además, que EMB indicara cuántas estructuras, incluso las torres de transmisión, se encontraban en el terreno arrendado y cuántas antenas de telecomunicaciones, discos o antenas parabólicas, torres o artefactos de radio, teléfono inalámbrico o telecomunicación existían en el terreno arrendado.
Mediante moción a esos efectos, EMB solicitó ser eximido de contestar este segundo pliego de interrogatorios; ello en vista de que entendía que la controversia planteada en el caso era si ésta podía subarrendar el predio arrendado y que resultaba impertinente saber cuántas torres o antenas parabólicas había en el predio arrendado para resolver la controversia.
Los codemandantes se opusieron a la referida moción y argumentaron que la razón por la cual EMB se negaba a contestar los referidos interrogatorios era porque quería ocultar la existencia de 119 antenas de transmisión que se encontraban ubicadas en las tres torres de transmisión, y de 70 licencias de equipos de transmisión de radio en el área arrendada, pertenecientes éstas a 35 entidades *338 diferentes. Según los codemandantes, dicha información surgía de un informe preparado por el ingeniero Alejandro Luciano, perito contratado por dicha parte.
El tribunal de instancia le ordenó a EMB que supliera la información que solicitaba la Sucesión, excepto en relación con la cantidad que EMB devengaba de los subarriendos; ello por entender que dicha información no era pertinente. En cumplimiento con la orden del tribunal de instancia, EMB contestó el segundo pliego de interrogatorios. En esencia, admitió la existencia de tres torres y de 125 antenas de transmisión, pertenecientes a más de 35 entidades. Ello no obstante, y ya que el tribunal de instancia no lo ordenó, en la referida contestación no se incluyó información alguna en cuanto a los contratos de subarrendamiento ni en cuanto al beneficio económico derivado de éstos. En vista de lo anteriormente expresado, se desconoce al presente a cuánto ascienden los cánones de subarrendamiento que recibe EMB en concepto de los subarrendamientos que ha llevado a cabo.
Así las cosas, EMB presentó una solicitud de sentencia sumaria alegando, nuevamente, que en la medida en que en el contrato no existía prohibición alguna de subarrendar los terrenos, el arrendador no tenía derecho a oponerse a ello; según alegó, la controversia del caso se limitaba a decidir si ella podía subarrendar el terreno en cuestión.
La Sucesión se opuso a que se dictara una sentencia sumaria. En la referida oposición alegó que no cuestionaba la facultad de EMB de subarrendar el terreno, sino sil deber de informarlo para así haber estado en posición de negociar un canon de arrendamiento razonable y justo.
El Tribunal de Primera Instancia, luego de celebrar una vista, dictó sentencia mediante la cual desestimó la demanda presentada por la Sucesión Ortiz Brunet contra EMB. El referido foro, en primer lugar, determinó que, al no haber prohibición de subarrendar en el contrato de arrendamiento, la Sucesión no tenía derecho a oponerse a *339 ello. En consecuencia, el foro primario determinó que el monto económico de los contratos de subarriendo existentes entre EMB y los subarrendatarios no era un hecho material ni necesario para adjudicar el caso.
Inconforme, la Sucesión Ortiz Brunet apeló al Tribunal de Apelaciones. El referido foro revocó la sentencia emitida por el tribunal de instancia. Resolvió que, conforme a los principios de la buena fe contractual, EMB debió informar a la Sucesión de los subarriendos, de modo que éstos pudieran haber estado en mejor posición para determinar cuál era el canon de arrendamiento más justo y razonable para las partes. Resolvió, además, el foro apelativo que existía controversia de hechos y de derecho, por lo cual el caso no podía ser resuelto por la vía sumaria.
II
En la opinión disidente se concluye que no constituye mala fe el hecho que una parte oculte, de forma voluntaria y consciente, un hecho esencial en la negociación: en este caso, el hecho que EMB, al momento de renegociar la escritura de arrendamiento, subarrendaba la propiedad y derivaba un beneficio económico de ello. No podemos estar de acuerdo con esta posición.
De entrada, es menester señalar que no existe controversia sobre el hecho que en el contrato de arrendamiento suscrito entre las partes no existía prohibición alguna de subarrendar. En virtud de ello, EMB estaba plenamente facultado a subarrendar la propiedad en cuestión. Ello no obstante, está claramente en controversia el hecho de si EMB tenía un deber de informar que había subarrendado el terreno; más aún, cuando lo hacía en tal magnitud y derivando gran cantidad de dinero por ese concepto.
Dicha situación requiere que repasemos los principios de la buena fe en la contratación, según preceptuados por nuestro Código Civil y por nuestra jurisprudencia.
*340 A. Como es sabido, las partes que suscriben un contrato no están únicamente sujetas a cumplir con lo pactado, sino que también están sujetas a todas las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 L.P.R.A. see. 3375. Los contratantes tienen el deber recíproco de actuar con buena fe aun cuando no haya una disposición específica que los obligue a ello. Véase González v. The Commonwealth Ins. Co., 140 D.P.R. 673, 683 (1996).
La buena fe permea todo el proceso de contratación, desde sus fases iniciales preparatorias, durante la negociación del contrato propiamente y durante la fase de su cumplimiento.(2) Además, el referido principio impone deberes especiales de conducta de acuerdo con la naturaleza de la relación jurídica y con la finalidad perseguida por las partes a través de ella. Arthur Young & Co. v. Vega III, 136 D.P.R. 157 (1994).
Es claro entonces que al contratar, las partes tienen que cumplir con ciertos deberes especiales de conducta. En lo referente a estos deberes, expresamos en Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 528 (1982), que “fija buena fe impone a las partes un deber de lealtad recíproca en las negociaciones”. (Énfasis nuestro.)
En igual sentido, en Colón v. Glamourous Nails, 167 D.P.R. 33, 45 (2006), citando a Diez-Picazo, este Tribunal avaló la posición de que
“[Z]a buena fe, en el sentido que aquí importa, es la lealtad en el tratar, el proceder honrado y leal. Supone el guardar la fidelidad a la palabra dada y no defraudar la confianza, ni abusar de ella; supone un conducirse como cabe esperar de cuantos, con pensamiento honrado, intervienen en el tráfico como contratantes. Lo que se aspira a conseguir, se ha dicho, es que el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones, se *341 produzca conforme a una serie de principios que la conciencia jurídica considera necesarios, aunque no hayan sido formulados.” (Enfasis en el original suprimido y énfasis nuestro.) Véase L. Diez-Picazo, La doctrina de los propios actos, Barcelona, Eds. Aries, 1963, pág. 157.
No cabe duda, entonces, que las partes que contratan tienen que actuar de buena fe. Este “negociar de buena fe” significa que las partes están obligadas a comportarse de forma honrada y leal, de modo que los contratos que resulten de la negociación reflejen una voluntad que no sea producto de la malicia y del engaño. De este modo, se protege la estabilidad de los negocios y se limitan las acciones judiciales para la revisión de dichos contratos.
B. No hay duda de que uno de los supuestos de mala fe precontractual se configura cuando el silencio de una parte vicia el consentimiento de la otra. A esos efectos, en Márquez v. Torres Campos, 111 D.P.R. 854 (1982), y en Bosques v. Echevarría, 162 D.P.R. 830 (2004), este Tribunal resolvió que el no revelar ciertos hechos importantes durante el proceso de negociación constituye dolo contractual. Específicamente en Márquez, ante, este Tribunal avaló una acción de indemnización en daños por causa del dolo contractual. En Bosque Soto, ante, este Tribunal decretó la anulación del contrato por vicios del consentimiento causado por los actos dolosos de una de las partes. En ambos casos, el acto doloso consistió en que una de las partes calló sobre un aspecto importante de la negociación.(3)
*342 “El dolo se entiende como todo un complejo de malas artes, contrario a la honestidad e idóneo para sorprender la buena fe ajena, generalmente para beneficio propio, en que viene a resumirse el estado de ánimo de aquel que no sólo ha querido el acto, sino que, además, ha previsto y querido las consecuencias antijurídicas provenientes de él.” (Enfasis nuestro.) Colón v. Promo Motor Imports, Inc., 144 D.P.R. 659, 666 (1997).
Vemos, pues, que el callar sobre un aspecto importante objeto del contrato —además de ser un acto doloso— constituye mala fe. No hay duda que EMB ocultó deliberadamente el hecho de que subarrendaba la propiedad en cuestión. ¿Cumple una parte que esconde que deriva un gran beneficio económico —aprovechando que no está impedida de subarrendar la propiedad— con los deberes especiales de lealtad recíproca al contratar? Somos del criterio que la contestación a esta interrogante tiene que ser en la negativa.
No podemos pasar por alto que el propósito de este Tribunal al resolver los casos Márquez v. Tores Campos, ante, y Bosques Soto v. Echevarría, ante, fue precisamente proteger el principio de la buena fe en la contratación. Dicho de otra forma, las decisiones de este Tribunal en estos casos —al conceder en uno la indemnización en daños y al anular en el otro el contrato por vicios del consentimiento— constituyen un rechazo absoluto a las actuaciones dolosas y de mala fe observadas por una de las partes contratantes en los contratos que estaban en controversia en los mencionados casos.
En este caso estamos ante una aplicación particular de la figura del dolo, que consiste en el silencio precontractual. En estos casos lo importante no son las diligencias que pudo o no pudo haber realizado una parte para averiguar lo que se le ocultaba o si una de las partes era o no un prominente abogado; el silencio observado por una de las partes viola los deberes especiales de lealtad que *343 impone la figura de la buena fe contractual. En otras palabras, repetimos, el dolo caracterizado por el silencio precontractual constituye mala fe.
Creemos que la buena fe que tiene que exhibir una parte definitivamente no puede estar sujeta a revelar sólo lo que le es inquirido. Nos parece obvio que actuar de buena fe incluye no esconder ciertos hechos esenciales para una negociación justa. No actúa de forma leal y honrada el arrendatario que, al momento de renegociar un contrato de arrendamiento, esconde que está subarrendando el predio arrendado.
La opinión disidente constituye un retroceso impermisible en la doctrina sobre la buena fe contractual en nuestra jurisdicción. Esa opinión reduce las obligaciones contractuales a lo siguiente: si no me preguntan, no tengo por qué revelarlo. El principio de la buena fe no depende de lo que una parte pudo haber averiguado, mediando una razonable diligencia, sino que corresponde a lo que las partes debieron revelarse mutuamente durante el proceso de negociación. Este es el deber especial de lealtad que exige dicho principio.
Creemos que la cantidad de dinero que un arrendatario deriva al ejercer su facultad de subarrendar una propiedad, es información importante que éste tiene el deber de divulgar a su arrendador. Ello precisamente porque al negociar un contrato las partes deben estar en posesión de toda la información pertinente para poder establecer sus términos adecuadamente.
Por consiguiente, no podemos estar de acuerdo con la posición disidente, a los efectos de que la mera desproporción entre ciertas prestaciones futuras es insuficiente para producir un deber de informar los hechos pertinentes. En definitiva, y contrario a lo que la opinión disidente pretende que se resuelva, el principio de lealtad le imponía a EMB el deber de revelar “motu proprio” los subarriendos realizados.
*344 Si esto no fuera así, ¿para qué hablar de la buena fe? Estaríamos fomentando que las negociaciones en este país estén plagadas de omisiones en que sólo la parte más lista vencerá. Ello no puede sostenerse; el deber de informar los hechos pertinentes es exigible en todo tipo de negociación, independientemente de sus consecuencias económicas futuras.
HH HH HH
Vale la pena resaltar que lo que solicita la Sucesión demandante en este caso es que se le conceda la oportunidad de atemperar las causas del contrato, de modo que el canon que ésta cobra por el arrendamiento de su propiedad sea razonable, en comparación con el beneficio económico derivado por EMB del subarriendo de un terreno del cual no es dueño. Consideramos que este remedio es razonable y procedente.
Este Tribunal ha expresado que si una parte falta a la buena fe contractual, procede anular el contrato. Levy v. Aut. Edif. Públicos, 135 D.P.R. 382, 395 (1994). Ello no obstante, hemos avalado la posición de que
“[e]n casos apropiados, no habrá de llegarse a la aniquilación de la libertad contractual, recurriendo a la alternativa de revisabilidad del contrato, un concepto intermedio situado entre los dos polos de la validez y de la nulidad, cuyo núcleo es la sustitución parcial de la voluntad privada por la voluntad estatal y que preserva la eficacia esencial del negocio. M. Royo Martínez, Transformación del concepto del contrato en el derecho moderno, 177 Rev. Gen. Legis. Juris, 113-157 y ss. (1945). F. Puig Pena, Compendio de Derecho Civil Español, 3ra. ed., Madrid, Eds. Pirámide, 1976, T. 3, pág. 338 y ss.” (Énfasis nuestro y en el original.) Levy v. Aut. Edif Públicos, ante, pág. 395.
Por consiguiente, la revisión del contrato es una alternativa viable en casos en que una parte ha procedido de *345 mala fe.(4) Util. Cons. Servs. v. Mun. de San Juan, 115 D.P.R. 88 (1984);(5) Levy v. Aut. Edif. Públicos, ante.
En el caso Util. Cons. Servs. v. Mun. de San Juan, ante, avalamos, además, la facultad de los tribunales “para atemperar la irracionalidad de la causa cuando ésta hiere el principio de la reciprocidad de las prestaciones y la norma de buena fe del citado Art. 1210”. Util. Cons. Servs. v. Mun. de San Juan, ante, pág. 90.(6)
Reconocemos, claro está, que la intervención moderadora del tribunal con la autonomía contractual debe darse sólo en circunstancias extraordinarias. Esto tiene que ser así por su efecto lesivo a la estabilidad de los contratos y a la seguridad jurídica. López de Victoria v. Rodríguez, 113 D.P.R. 265 (1982).
Además, y en relación con el concepto jurídico de la buena fe, hemos reconocido que en todo contrato esta implícito el elemento de justicia objetiva, por lo que hay facultad en los tribunales para atemperar la excesiva onerosidad de algún término contractual que hiera el principio de la reciprocidad de las prestaciones. Véanse: López de Victoria v. Rodríguez, ante; M. J. Godreau Robles, Lealtad y Buena Fe Contractual, LVII (Núm. 3) Rev. Jur. U.P.R. 367 (1989).
A esos efectos, el profesor Godreau ha expresado que “[p]or más claro que pueda redactarse un texto contractual, si en el mismo se recogen prestaciones que violentan las expectativas razonables de la otra parte, es de esperar que cualquier juzgador con un claro sentido ético le reste eficacia a la literalidad de la redacción, máxime si del mismo se derivan consecuencias injustas”. (Enfasis nuestro.) M.J. Godreau, Análisis del término del Tribunal *346 Supremo en materia de derecho civil patrimonial 1994-1995, 65 Rev. Jur. U.P.R. 773, 792 (1996).(7)
Asimismo, el tratadista Juan Terraza Martorell, en su obra Modificación y resolución de los contratos por excesiva onerosidad o imposibilidad en su ejecución, Barcelona, Ed. Bosch, 1951, págs. 102-103, indica que:
El centro de gravedad de toda relación contractual reside en la prestación, y como la desconexión suele producirse porque una de las prestaciones o intereses en cuestión, se mantiene en situación análoga conservando su identidad mientras que la otra prestación se ha agravado enormemente, la solución lógica y correcta es la que tiende a reestablecer el equilibrio, y si las partes voluntariamente no logran un acuerdo compensador, parece natural que un órgano de autoridad preferentemente el judicial actúe como mediador para imponer la solución que permita mayor justicia, bien acomodando el contrato a la nueva situación, bien dándolo por terminado si ya no es posible rehabilitarlo. (Enfasis nuestro.)
En conclusión, creemos que la mala fe de EMB al no informar que estaba subarrendando el terreno, y la aparente disparidad entre el canon de arrendamiento que paga EMB versus lo que ésta recibe en concepto de cánones de subarrendamiento —producto de dicha mala fe—justifican la modificación del referido canon.
En virtud de la conclusión a la que arribamos, procede la confirmación de la sentencia dictada por el foro apelativo. En vista de ello, resulta igualmente procedente devolver el caso para que el foro primario ordene el descubrimiento de prueba solicitado por la Sucesión y determine *347 el canon razonable y justo, dadas las circunstancias presentes en el caso.

 A esos efectos, el foro primario emitió una orden para que la parte demandante efectuara todo descubrimiento de prueba, incluso una inspección ocular por un perito que le permitiera determinar el número de antenas, torres o artefactos de telecomunicaciones instalados en el predio arrendado, además de documentos que acreditaran si en algún momento previo a suscribirse el nuevo contrato, las partes discutieron algún asunto relacionado con la instalación de las antenas o la existencia de contratos de subarrendamiento.

 En el caso Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517 (1982), reconocimos que los deberes que se derivan de la buena fe se extendían a las negociaciones que antecedían el contrato.

 En Márquez v. Torres Campos, 111 D.P.R. 854 (1982), el dolo consistió en que el vendedor de unas reses no informó a su comprador que éstas provenían de un hato que estaba bajo cuarentena por estar infectado con tuberculosis. Respecto a ello, este Tribunal expresó que constituyó dolo el callar voluntaria y conscientemente la condición de contagio del ganado. En Bosques v. Echevarría, 162 D.P.R. 830 (2004), el dolo consistió en que el vendedor de un automóvil no notificó a sus compradores que éste había sido impactado y reparado previo a la venta. En este caso, este Tribunal entendió que el accidente del vehículo y la posterior reparación eran elementos esenciales que el comprador hubiese tomado en consideración al momento de contratar, de haberlos conocido.

 Esto responde a que la anulación es la más perjudicial de las soluciones. J. Terraza Martorell, Modificación y resolución de los contratos por excesiva onerosidad o imposibilidad en su ejecución, Barcelona, Ed. Bosch, 1951, pág. 107.

6) En dicho caso disentimos por otros fundamentos.

 Citado en Levy v. Aut. Edif. Públicos, 135 D.P.R. 382, 395 (1994).

 En igual sentido, añade que:
“ ‘[E]l principio de la buena fe requiere en este tipo de relación que cada parte se comporte, no sólo en forma correcta y honesta, sino más aún, en forma LEAL Y COOPERADORA a fin de que cada cual coadyuve a que el otro logre las expectativas patrimoniales razonables y conocidas. Ello puede requerir, en determinadas circunstancias, el apartarse del texto concreto del pacto si una interpretación literal del mismo frustra las expectativas conocidas de la otra parte.’ ” (Énfasis suprimido.) M. J. Godreau, Análisis del término del Tribunal Supremo en materia de derecho civil patrimonial 1994-1995, 65 Rev. Jur. U.P.R. 773,792-793 (1996).