EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Carlos Ortiz Brunet, et als.<br><br>Recurrida<br><br>v.<br><br>El Mundo Broadcasting Corporation, et als.<br><br>Peticionaria | Certiorari<br><br>2006 TSPR 154<br><br>169 DPR _____ |

Número del Caso: CC-2005-704

Fecha: 18 de octubre de 2006

Tribunal de Apelaciones:

                Región Judicial de San Juan Panel V

Juez Ponente:
            Hon. Erik J. Ramírez Nazario

Abogados de la Parte Peticionaria:

            Lcdo. Ricardo Luis Ortiz Colón
            Lcda. María Luisa Montalvo Vera

Abogado de la Parte Recurrida:

            Lcdo. John E. Mudd

Materia: Incumplimiento de Contrato y Daños

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Ortiz Brunet, *et als.*,

    Recurrida

        v.                         CC-2005-704

El Mundo Broadcasting
Corporation, *et als.*,

    Peticionaria

SENTENCIA

San Juan, Puerto Rico, a 18 de octubre de 2006

El Mundo Broadcasting Corporation, (El Mundo o el peticionario), acudió oportunamente ante nosotros solicitándonos la revocación de la sentencia dictada por el Tribunal de Apelaciones en el caso de epígrafe. En su sentencia, el foro apelativo revocó una sentencia dictada sumariamente por el Tribunal de Primera Instancia, donde se desestimó con perjuicio la demanda instada por los recurridos. En su demanda, los recurridos reclamaban daños y perjuicios por un alegado incumplimiento de contrato de arrendamiento por parte de El Mundo. En esencia, los recurridos adujeron que el peticionario actuó de mala fe al momento de renovar el contrato de arrendamiento

por no haberles informado que El Mundo había subarrendado la propiedad objeto del contrato, y que el canon de subarrendamiento sobrepasa significativamente los cánones pactados entre ellos y el peticionario.

Por su parte, el peticionario negó toda actuación de mala fe, y arguyó que el contrato de arrendamiento no impedía el subarrendamiento así como tampoco exigía que se informara qué canon se cobraba por subarrendar. En su petición de sentencia sumaria indicó que los recurridos habían incurrido en falta de diligencia al momento de la renovación del contrato al no inspeccionar el predio arrendado, lo que hubiera evidenciado que, en efecto, el lugar se había subarrendado.

El Tribunal de Apelaciones revocó al foro primario al resolver que no procedía dictar sentencia sumariamente toda vez que se debió haber indagado si hubo una lesión al principio de reciprocidad contractual y la buena fe. El foro apelativo intermedio dispuso que se debió determinar si, además, "[d]e lo expresamente pactado, la buena fe creó unos deberes especiales de conducta exigibles de acuerdo a la naturaleza de la relación jurídica y la finalidad perseguida entre las partes." En segundo lugar, el foro apelativo determinó que no hubo un descubrimiento de prueba adecuado por lo que procedía también dejar sin efecto la sentencia del foro primario.

Inconforme con dicha determinación, El Mundo acudió oportunamente ante nosotros y solicitó se revocara la determinación del foro apelativo. En su recurso ante

nosotros planteó la comisión de los siguientes errores:

> Erró el Tribunal de Apelaciones al revocar la sentencia dictada por el tribunal de instancia por alegadamente existir controversias de hechos y de derecho.

> Determinar que el tribunal de instancia había abusado de su discreción al limitar el descubrimiento de prueba.

Expedimos el auto solicitado y ambas partes han comparecido.

Luego de evaluar los planteamientos de las partes, se confirma el dictamen del Tribunal de Apelaciones por estar este Tribunal igualmente dividido.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López emitió una Opinión de Conformidad. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión disidente. La Jueza Asociada señora Fiol Matta disiente sin opinión escrita. El Juez Presidente señor Hernández Denton inhibido. El Juez Asociado señor Rivera Pérez no intervino.

                              Aida Ileana Oquendo Graulau
                              Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Ortiz Brunet, et als

    Recurridos

        vs.                  CC-2005-704

El Mundo Broadcasting
Corporation, et als

    Peticionario

OPINIÓN DE CONFORMIDAD EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 18 de octubre de 2006

Estamos <u>contestes</u> en que procede decretar la <u>confirmación</u> de la sentencia emitida en el presente caso por el Tribunal de Apelaciones. Diferimos, vehementemente, de la posición asumida en la Opinión disidente; ello, no solo porque dicha posición resulta ser errónea e injusta sino porque pretende premiar las actuaciones deshonestas de una parte contratante, las cuales, a la vez, son totalmente contrarias al principio de la buena fe contractual, elemento indispensable en todo proceso de negociación en nuestra jurisdicción.

I

En 1953, los esposos Jorge Ortiz Toro y Rita Brunet Calaf suscribieron un contrato de

arrendamiento con El Mundo Broadcasting (en adelante EMB), sobre una finca de su propiedad, de aproximadamente cinco cuerdas, ubicada en el Barrio Sonadora de Aguas Buenas, Puerto Rico. El arrendamiento fue pactado por un término de cincuenta años, comenzando a partir del 1 de julio de 1953, con derecho a ser renovado una vez transcurriera ese primer término, por un término adicional de cuarenta y nueve años por un canon de $150 mensuales.

El 11 de octubre de 1994 --antes del vencimiento del primer término del contrato-- los miembros de la Sucesión de Jorge Ortiz Toro y Rita Brunet Calaf, ratificaron el contrato de arrendamiento suscrito originalmente por sus padres con EMB. En dicho acto las partes enmendaron el referido contrato, acordando aumentar el canon de arrendamiento a la cantidad de $691.40 mensuales. Acordaron, además, que durante el término de duración del contrato, o durante cualquier período adicional, el canon de arrendamiento mensual aumentaría un diez por ciento (10%) cada diez años. En la mencionada escritura de ratificación <u>no</u> se hizo constar cláusula alguna que prohibiera a EMB a subarrendar el predio objeto del contrato de arrendamiento.

El 15 de noviembre de 2002, EMB ejerció su derecho de renovar el contrato de arrendamiento por un periodo de cuarenta y nueve años. <u>EMB nunca le informó a la Sucesión Ortiz Brunet que había subarrendado, o estaba en proceso de subarrendar, parte del terreno para colocar otras torres de</u>

transmisión. Por otro lado, la referida Sucesión, nunca requirió de EMB información al respecto.

El 28 de enero de 2003, luego de que EMB ejerciera su derecho a extender el contrato, la Sucesión Ortiz Brunet le envió una carta a ésta indicándole que habían advenido en conocimiento de que en el terreno arrendado existían torres de transmisión que no pertenecían a EMB. Además, por medio de dicha carta solicitaron discutir la cuestión del monto del arrendamiento debido a la existencia de los referidos subarriendos. EMB no contestó la carta antes mencionada.

Por consiguiente, el 3 de julio de 2003, la Sucesión Ortiz Brunet presentó una demanda contra El Mundo Broadcasting, ante el Tribunal de Primera Instancia, Sala Superior de San Juan. En la referida demanda alegó que durante la renegociación del contrato de arrendamiento en el 1994 y, posteriormente, al ejercer su derecho a extender el mismo en el 2002, EMB ocultó que había subarrendado el terreno, permitiendo la instalación de torres de transmisión radial adicionales a la suya y devengando ingresos de dichos arrendamientos. Alegó la Sucesión que dichos ingresos resultaban ser mucho mayores de lo que éstos pagaban como canon de arrendamiento original. El ocultar esta información al momento de renegociar el contrato de arrendamiento, constituía, según la Sucesión, una violación al principio de la buena fe contractual. En virtud de ello, la Sucesión solicitó la cancelación del contrato por incumplimiento del mencionado requisito de

buena fe. En la alternativa, la Sucesión solicitó que el foro de instancia ordenara la renegociación del canon de arrendamiento y que para ello se tomara en cuenta los cánones de subarrendamiento y otros beneficios que EMB había estado recibiendo por las torres de transmisión instaladas en el referido predio de terreno.

La Sucesión solicitó del foro de instancia que ordenara se realizara descubrimiento de prueba. Así ordenado, la Sucesión cursó un primer pliego de interrogatorios a EMB. En el mismo, los demandantes inquirieron de EMB sobre cuántas torres de telecomunicaciones habían sido enclavadas en el predio. EMB contestó que sólo dos torres, construidas una en el año 1953 y la otra aproximadamente en el año 1958. Los dueños de las referidas torres eran las Compañías Telemundo y Teleonce, respectivamente. Además, en dicho interrogatorio EMB aceptó que el predio arrendado estaba siendo subarrendado por ésta. En un escrito posterior, EMB admitió que en realidad había tres torres de transmisión en el predio.

Posteriormente, y con permiso del tribunal de instancia[1], los codemandantes cursaron un segundo pliego de

---

[1] A esos efectos, el foro primario emitió una orden para que la parte demandante efectuara todo descubrimiento de prueba incluyendo una inspección ocular por un perito que le permitiera determinar el número de antenas, torres o artefactos de telecomunicaciones instalados en el predio arrendado, además de documentos que acreditaran si en algún momento previo a suscribirse el nuevo contrato, las partes

interrogatorios. En éste, la Sucesión solicitó que EMB contestara, por cada subarriendo, el nombre, dirección y teléfono de la persona a quien se subarrendaba, el canon de subarrendamiento desde su inicio al presente; y la copia de los contratos de subarrendamiento. Solicitaron, además, que indicara cuántas estructuras, incluyendo torres de transmisión, se encontraban en el terreno arrendado y cuantas antenas de telecomunicaciones, discos o antenas parabólicas, torres o artefactos de radio, teléfono inalámbrico o telecomunicación existían en el terreno arrendado.

Mediante moción a esos efectos, EMB solicitó ser eximido de contestar este segundo pliego de interrogatorios; ello en vista de que entendía que la controversia planteada en el caso era si ésta podía subarrendar el predio arrendado y que para resolverla resultaba impertinente saber cuántas torres o antenas parabólicas habían en el predio arrendado.

Los codemandantes se opusieron a la referida moción y argumentaron que la razón por la cual EMB se negaba a contestar los referidos interrogatorios era porque quería ocultar la existencia de 119 antenas de transmisión que se encontraban ubicadas en las tres torres de transmisión, y de 70 licencias de equipos de transmisión de radio en el

---

discutieron algún asunto relacionado con la instalación de las mismas y/o la existencia de contratos de subarrendamiento.

área arrendada, <u>pertenecientes éstas a 35 entidades diferentes</u>. Según los codemandantes, dicha información surgía de un informe preparado por el Ingeniero Alejandro Luciano, perito contratado por dicha parte.

El tribunal de instancia le ordenó a EMB que supliera la información que solicitaba la Sucesión <u>excepto en relación a la cantidad que EMB devengaba de los subarriendos; ello por entender que dicha información no era pertinente</u>. En cumplimiento con la orden del tribunal de instancia, EMB contestó el segundo pliego de interrogatorios. En esencia, <u>admitió</u> la existencia de tres torres, de 125 antenas de transmisión, pertenecientes a más de 35 entidades. Ello no obstante, y ya que el tribunal de instancia no lo ordenó, en la referida contestación <u>no</u> se incluyó información alguna en cuanto a los contratos de subarrendamiento, ni en cuanto al beneficio económico derivado de estos. <u>En vista de lo anteriormente expresado, al presente se desconoce a cuánto ascienden los cánones de subarrendamiento que recibe EMB por concepto de los subarrendamientos que ha llevado a cabo</u>.

Así las cosas, EMB presentó una solicitud de sentencia sumaria alegando, nuevamente, que en la medida en que en el contrato no existía prohibición de subarrendar los terrenos, el arrendador no tenía derecho a oponerse a ello; según alegó, la controversia del caso se limitaba a decidir si ella podía subarrendar el terreno en cuestión.

La Sucesión presentó oposición a que se dictara sentencia sumaria. En la referida oposición alegó que no estaba cuestionando la facultad de EMB de subarrendar el terreno, sino de su **deber de informarlo** para así poder haber estado en posición de negociar un canon de arrendamiento razonable y justo.

El Tribunal de Primera Instancia, luego de celebrar una vista, dictó sentencia desestimando la demanda radicada por la Sucesión Ortiz Brunet en contra de EMB. El referido foro, en primer lugar, determinó que, al no haber prohibición de subarrendar en el contrato de arrendamiento, la Sucesión no tenía derecho a oponerse a ello. En consecuencia, el foro primario determinó que el monto económico de los contratos de subarriendo existentes entre EMB y los subarrendatarios no era un hecho material ni necesario para adjudicar el caso.

Inconforme, la Sucesión Ortiz Brunet apeló ante el Tribunal de Apelaciones. El referido foro revocó la sentencia emitida por el tribunal de instancia. Resolvió que, conforme a los principios de la buena fe contractual, EMB debió informar a la Sucesión de los subarriendos de modo que éstos pudieran haber estado en mejor posición para determinar cuál era el canon de arrendamiento más justo y razonable para las partes. Resolvió, además, el foro apelativo que existía controversia de hechos y de derecho, por lo cual el caso no podía ser resuelto por la vía sumaria.

II

En la Opinión disidente se concluye que <u>no</u> constituye mala fe el hecho que una parte oculte, de forma voluntaria y consciente, un hecho esencial en la negociación: <u>en este caso</u>, el hecho que EMB, al momento de renegociar la escritura de arrendamiento, subarrendaba la propiedad y derivaba beneficio económico de ello. <u>No podemos estar de acuerdo con esta posición</u>.

De entrada, es menester señalar que no existe controversia sobre el hecho que en el contrato de arrendamiento suscrito entre las partes <u>no</u> existía prohibición alguna de subarrendar. En virtud de ello, EMB estaba plenamente facultado a subarrendar la propiedad en cuestión. Ello no obstante, está claramente en controversia el hecho de si EMB tenía un <u>deber de informar</u> que había subarrendado el terreno, y, más aun, cuando lo hacía en tal magnitud y derivando gran cantidad de dinero por dicho concepto.

Dicha situación requiere que repasemos los principios de la buena fe en la contratación según preceptuados por nuestro Código Civil y por nuestra jurisprudencia.

A

Como es sabido, las partes que suscriben un contrato no están únicamente sujetas a cumplir con lo pactado, sino también a todas las consecuencias que, según su naturaleza, <u>sean conformes a la</u> <u>buena fe</u>, al uso y a la ley. Artículo

1210 del Código Civil, 31 L.P.R.A. sec. 3375. Los contratantes tienen este deber recíproco de actuar con buena fe aun cuando no haya una disposición específica que los obligue a ello. Véase: González v. The Commonwealth Ins. Co., 140 D.P.R. 673, 683 (1996).

La buena fe permea todo el proceso de contratación, desde sus fases iniciales preparatorias, durante la negociación del contrato, propiamente, y durante la fase de su cumplimiento.[2] Además, el referido principio impone deberes especiales de conducta de acuerdo con la naturaleza de la relación jurídica y con la finalidad perseguida por las partes a través de ella. Arthur Young & Co. v. Vega III, 136 D.P.R. 157 (1994).

Es claro entonces que al contratar, las partes tienen que cumplir con ciertos deberes especiales de conducta. En lo referente a estos deberes, expresamos en Prods. Tommy Muñiz v. COPAN, ante, a la pág. 528, que "[l]a buena fe impone a las partes un deber de lealtad recíproca en las negociaciones".

En igual sentido, en Colón v. Glamour Nails & Boutique, res. el 3 de febrero de 2006, 2006 T.S.P.R. 16, citando a Díez Picazo, este Tribunal avaló la posición a los efectos de que:

---

[2] En el caso Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517 (1982), reconocimos que los deberes que se derivan de la buena fe se extendían a las negociaciones que antecedían el contrato.

> La buena fe, en el sentido que aquí importa, **es la lealtad en el tratar, el proceder honrado y leal**. Supone el guardar la fidelidad a la palabra dada y no defraudar la confianza, ni abusar de ella; supone un conducirse como cabe esperar de cuantos, con pensamiento honrado, intervienen en el tráfico como contratantes. Lo que se aspira a conseguir, se ha dicho, es que el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones, se produzca conforme a una serie de principios que la conciencia jurídica considera necesarios, aunque no hayan sido formulados. Díez Picazo, *La Doctrina de los Actos Propios*, Barcelona, 1963, en la pág. 157. (Énfasis suplido.)

No cabe duda, entonces, que las partes que contratan tienen que actuar de buena fe. Este "negociar de buena fe" significa que las partes están obligadas a comportarse de forma honrada y leal  de modo que los contratos que resulten  de la  negociación  reflejen una voluntad que no sea producto de la malicia y del engaño. De este modo, se protege la estabilidad de los negocios y se limitan las acciones judiciales en revisión de dichos contratos.

B

No hay duda de que uno de los supuestos de **mala fe** precontractual  se configura cuando el **silencio** de una parte vicia el consentimiento de la otra. (Énfasis nuestro).  A esos efectos, en Márquez v. Torres Campos, 111 D.P.R. 854 (1982) y Bosques Soto v. Echevarría Vargas, res. el 13 de septiembre de 2004, 2004 T.S.P.R. 149, este Tribunal resolvió que el no revelar ciertos hechos

importantes durante el proceso de negociación constituye dolo contractual.

Específicamente, en Márquez, ante, este Tribunal avaló una acción de indemnización en daños por causa del dolo contractual. En Bosque Soto, ante, este Tribunal decretó la anulación del contrato por vicios del consentimiento causado por actos dolosos de una de las partes. En ambos casos, el acto doloso consistió en que una de las partes calló sobre un aspecto importante de la negociación.[3]

"El dolo se entiende como todo un complejo de malas artes, contrario a la honestidad e idóneo para sorprender la buena fe ajena, generalmente para beneficio propio, en que viene a resumirse el estado de ánimo de aquel que no sólo ha querido el acto, sino que, además, ha previsto y querido las consecuencias antijurídicas provenientes de él". Colón v. Promo Motor Imports, 144 D.P.R. 659, 666 (1997).

---

[3] En Márquez, ante, el dolo consistió en que el vendedor de unas reses no informó a su comprador que las mismas provenían de un hato que estaba bajo cuarentena por estar infectado por tuberculosis. Respecto a ello, este Tribunal expresó que constituyó dolo el callar voluntaria y conscientemente respecto a la condición de contagio del ganado. En Bosques Soto, ante, el dolo consistió en que el vendedor de un automóvil no notificó a sus compradores que el mismo había sido impactado y reparado previo a la venta. En este caso, este Tribunal entendió que el accidente del vehículo y posterior reparación eran elementos esenciales que el comprador hubiese tomado en consideración al momento de contratar, de haberlos conocido.

Vemos, pues, que el callar sobre un aspecto importante objeto del contrato —además de ser un acto doloso— constituye mala fe. No hay duda que EMB ocultó **deliberadamente** el hecho de que subarrendaba la propiedad en cuestión. ¿Cumple una parte que esconde que está derivando gran beneficio económico aprovechando que no está impedida de subarrendar la propiedad con los deberes especiales de lealtad recíproca al contratar? Somos del criterio que la contestación a esta interrogante tiene que ser en la negativa.

No podemos pasar por alto que el propósito de este Tribunal, al resolver los casos de Márquez, ante y Bosques Soto, ante, fue precisamente proteger el principio de la buena fe en la contratación. Dicho de otra forma, las decisiones de este Tribunal en estos casos —al conceder indemnización en daños, en uno, y al anular el contrato por vicios del consentimiento, en el otro— constituyen un rechazo absoluto a las actuaciones dolosas y de mala fe observadas por una de las partes contratantes en los contratos en controversia en los mencionados casos.

En el presente caso estamos ante una aplicación particular de la figura del dolo que consiste en el silencio precontractual. En estos casos lo importante no son las diligencias que pudo, o no, haber realizado una parte para averiguar lo que le estaba siendo ocultado o si una de las partes era, o no, un prominente abogado; lo que viola los deberes especiales de lealtad que impone la

figura de la buena fe contractual, lo es el silencio observado por una de las partes. En otras palabras, repetimos, el dolo caracterizado por silencio precontractual constituye mala fe.

Somos del criterio que la buena fe que tiene que exhibir una parte, definitivamente, no puede estar sujeta a revelar únicamente lo que le es inquirido. Nos parece obvio que actuar de buena fe incluye el no esconder ciertos hechos esenciales para una negociación justa. No actúa de forma leal y honrada el arrendatario que, al momento de renegociar un contrato de arrendamiento, esconde que está subarrendando el predio arrendado.

La Opinión disidente constituye un retroceso impermisible en la doctrina sobre la buena fe contractual en nuestra jurisdicción. La misma reduce las obligaciones contractuales a lo siguiente: si no me preguntan, no tengo por qué revelarlo. El principio de la buena fe no depende de lo que una parte pudo haber averiguado, mediando razonable diligencia, sino que corresponde a lo que las partes debieron revelarse mutuamente durante el proceso de negociación. Este es el deber especial de lealtad que exige dicho principio.

Somos del criterio que la cantidad de dinero que un arrendatario deriva, al ejercer su facultad de subarrendar una propiedad, es información importante que éste tiene el deber de divulgar a su arrendador. Ello precisamente porque al negociar un contrato las partes deben estar en posesión

de toda la información pertinente para poder establecer sus términos adecuadamente.

Por consiguiente, <u>no</u> podemos estar de acuerdo con la posición disidente a los efectos de que la mera desproporción entre ciertas prestaciones futuras es insuficiente para producir un deber de informar los hechos pertinentes. <u>En definitiva, y contrario a lo que la Opinión disidente pretende que se resuelva, el principio de lealtad le imponía a EMB el deber de revelar *motu proprio* los subarriendos realizados</u>.

Si esto no fuera así, ¿para qué hablar de la buena fe? Estaríamos fomentando que las negociaciones en este país estén plagadas de omisiones en que solo la parte más lista vencerá. Ello <u>no</u> puede sostenerse; <u>el deber de informar los hechos pertinentes es exigible en todo tipo de negociación, independientemente de sus consecuencias económicas futuras</u>.

III

Vale la pena resaltar que lo que solicita la Sucesión demandante en el presente caso es, que se le conceda la oportunidad de <u>atemperar</u> las causas del contrato, de modo que el canon que ésta cobra por el arrendamiento de su propiedad, sea uno <u>razonable</u>, en comparación con el beneficio económico derivado por EMB del subarriendo de un terreno del cual no es dueño. Consideramos que este remedio es razonable y procedente.

Este Tribunal ha expresado que si una parte falta a la buena fe contractual procede anular el contrato. Levy v. Autoridad de Edificios Públicos, 135 D.P.R. 382, 395 (1994). Ello no obstante, hemos avalado la posición a los efectos que "en casos apropiados no habrá de llegarse a la aniquilación de la libertad contractual, recurriendo a la alternativa de revisabilidad del contrato, un concepto intermedio situado entre los dos polos de la validez y de la nulidad, cuyo núcleo es la sustitución parcial de la voluntad privada por la voluntad estatal y que preserva la eficacia esencial del negocio. Véase: M. Royo Martínez, Transformación del Concepto del Contrato en el Derecho Moderno, 177 Rev. Gen. Legis, Juris, 113-157 y 55. (1945). Véase, además: F. Puig Pena, Compendio de Derecho Civil Español, 3ra. ed., Madrid, Ed. Pirámide, 1976, T. 3, pág. 338 y ss. Por consiguiente la revisión del contrato es una alternativa viable en casos en donde una parte ha procedido de mala fe.[4] Utility Consulting Services, Inc. v. Municipio de San Juan, 115 D.P.R. 88, (1984), (Sentencia)[5]; Levy v. Autoridad de Edificios Públicos, ante.

En el citado caso de Utility Consulting Services, Inc., ante, avalamos, además, la facultad de los tribunales

---

[4] Esto responde a que la anulación es la más perjudicial de las soluciones. Juan Terraza Martorell, Modificación y Resolución de los Contratos por Excesiva Onerosidad o Imposibilidad en su Ejecución, Barcelona, Ed. Bosch, 1951, pág. 107.

[5] En dicho caso disentimos por otros fundamentos.

"para atemperar la irracionalidad de la causa cuando ésta hiere el principio de la reciprocidad de las prestaciones y la norma de buena fe del citado Art. 1210." Utility Consulting Services v. Municipio de San Juan, ante, a la pág. 90.[6]

Reconocemos, claro está, que la intervención moderadora del tribunal con la autonomía contractual debe darse sólo en circunstancias extraordinarias. Esto tiene que ser así, por su efecto lesivo a la estabilidad de los contratos y a la seguridad jurídica. López de Victoria v. Rodríguez, 113 D.P.R. 265 (1982).

Además, y en relación al concepto jurídico de la buena fe, hemos reconocido que en todo contrato esta implícito el elemento de justicia objetiva, por lo que hay facultad en los tribunales para atemperar la excesiva onerosidad de algún término contractual que hiera el principio de la reciprocidad de las prestaciones. Véase: López de Victoria v. Rodríguez, ante, y M. Godreau, Lealtad y Buena Fe Contractual, 58 Rev. Jur. U.P.R. 367 (1989). (Énfasis nuestro.)

A esos efectos el profesor Godreau ha expresado que "[p]or más claro que pueda redactarse un texto contractual, si en el mismo se recogen prestaciones que violentan las expectativas razonables de la otra parte, es de esperar que

---

[6] Citado en Levy v. Autoridad de Edificios Públicos, 135 D.P.R. 382, 395 (1994).

cualquier juzgador con un claro sentido ético le reste eficacia a la literalidad de la redacción, máxime si del mismo se derivan consecuencias injustas." M. Godreau, Análisis del Término del Tribunal Supremo en Materia de Derecho Civil Patrimonial 1994-1995, 65 Rev. Jur. U.P.R. 773, 792-793. (Énfasis nuestro.)[7]

Asimismo, el tratadista Juan Terraza Martorell, *op. cit.*, págs. 102-103, indica que:

> El centro de gravedad de toda relación contractual reside en la prestación, y como la desconexión suele producirse porque una de las prestaciones o intereses en cuestión, se mantiene en situación análoga conservando su identidad mientras que la otra prestación se ha agravado enormemente, la solución rápida y correcta es la que tiende a reestablecer el equilibrio y si las partes voluntariamente no logran un acuerdo compensador, parece natural que un órgano de autoridad preferentemente el judicial actúe como mediador para imponer la solución que permita mayor justicia, bien acomodando el contrato a la nueva situación, bien dándolo por terminado si ya no es posible rehabilitarlo. (Énfasis nuestro.)

En conclusión, somos del criterio que la mala fe de EMB al no informar que estaba subarrendando el terreno, y

---

[7] En igual sentido, añade que:

> [E]l principio de la buena fe requiere en este tipo de relación que cada parte se comporte, no solo en forma correcta y honesta, sino mas aun, en forma leal y cooperadora a fin de que cada cual coadyuve a que el otro logre las expectativas patrimoniales razonables y conocidas. Ello puede requerir, en determinadas circunstancias, el apartarse del texto concreto del pacto si una interpretación literal del mismo frustra las expectativas conocidas de la otra parte. M. Godreau, *op. cit.*, a la pág. 793.

la aparente disparidad entre el canon de arrendamiento que paga EMB versus lo que ésta recibe en concepto de cánones de subarrendamiento --producto de dicha mala fe-- justifican la modificación del referido canon.

En virtud de la conclusión a la que arribamos, procede la confirmación de la sentencia dictada por el foro apelativo. En vista de ello, resulta igualmente procedente devolver el caso para que el foro primario ordene el descubrimiento de prueba solicitado por la Sucesión y determine el canon razonable y justo, dadas las circunstancias presentes en el caso.

FRANCISCO REBOLLO LÓPEZ

Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Ortiz Brunet, *et als*.,

    Recurrida

        v.                          CC-2005-704

El Mundo Broadcasting
Corporation, *et als*.,

    Peticionaria

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 18 de octubre de 2006

Expedimos el auto de *certiorari* en el caso de epígrafe para revisar la revocación de una sentencia que desestimó sumariamente cierta demanda sobre conducta desleal relacionada con un arrendamiento. Somos del criterio que procedía confirmar la sentencia del foro primario razón por la cual disentimos de la determinación que hoy toma este Tribunal.

**I.**

Allá para 1953, los esposos Jorge Ortiz Toro y Rita Brunet Calaf arrendaron a El Mundo Broadcasting Corporation ("EMB") una finca de aproximadamente cinco cuerdas ubicada en el Barrio Sonadora de

Aguas Buenas, Puerto Rico. Se pactó un canon de $150 mensuales y un término de 50 años, prorrogable por 49 años a discreción del arrendatario. No hubo prohibición de subarrendamiento, y las partes contemplaron la posibilidad de que el arrendatario ejecutara mejoras o edificaciones, tanto muebles como inmuebles. El contrato se inscribió en el Registro de la Propiedad y entró en vigor el 1ro de julio de 1953. *Lease Agreement*, Apéndice de la Petición de Certiorari ("Apéndice"), págs. 41-47.

El 11 de octubre de 1994, los sucesores de Ortiz Toro y Brunet Calaf[8] otorgaron con EMB una escritura de ratificación y enmiendas al susodicho arrendamiento. La única modificación pertinente fue el establecimiento de un nuevo canon mensual. Éste comenzaría en $691.40 y aumentaría 10% cada diez años. **Cabe señalar que al menos uno de los sucesores otorgantes era un reconocido abogado quien estuvo a cargo de las negociaciones.** *Deed of Ratification and Amendment of Lease Agreement*, Apéndice, págs. 48-52; *Contestación a Interrogatorio*, Apéndice, págs. 154-172.[9]

Así las cosas, EMB notificó a los arrendadores su determinación de prorrogar el arrendamiento, mediante una

---

[8] Específicamente, Rita Ortiz Brunet, Eliza Ortiz Brunet, Carlos Ortiz Brunet, Jorge Antonio Ortiz Brunet y Antonio Ortiz Brunet.

[9] Aquí nos referimos a las contestaciones que hicieron Rita Ortiz Brunet, Carlos Ortiz Brunet, María M. San Miguel King, María Isabel San Miguel King, María del Mar Ortiz San Miguel, Jorge Ortiz San Miguel, Patricia Ortiz San Miguel y María Isabel Ortiz San Miguel a un interrogatorio de EMB.

carta con fecha de 15 de noviembre de 2002. Apéndice, págs. 53-61.

Los peticionarios instaron su *Demanda* el 3 de julio de 2003.[10] Principalmente alegaron lo siguiente: que EMB, además de tener su torre de transmisión radial en la finca, había subarrendado parte de la misma y permitido la instalación de otras torres; que los cánones de subarrendamiento excedían por mucho los del arrendamiento; que EMB ocultó esos hechos al negociarse la ratificación y enmiendas de 1994; que debido a ello, los demandantes carecieron el conocimiento necesario para negociar adecuadamente; y que EMB había desatendido sus intentos extrajudiciales de resolver la situación. Amparándose en el principio de la buena fe, los demandantes solicitaron la "cancelación" del contrato e indemnización de sus daños, o la renegociación del canon arrendaticio con miras al beneficio que EMB deriva de los subarrendamientos.[11] Apéndice, págs. 30-32.

Al cabo de varios sucesos procesales, el Tribunal de Primera Instancia desestimó sumariamente la demanda.

---

[10] Comparecieron en la *Demanda* --y comparecen ante nosotros-- Carlos Ortiz Brunet, Rita Ortiz Brunet, Eliza Ortiz Brunet, María del Mar Ortiz San Miguel, Jorge Antonio Ortiz San Miguel, Patricia Ortiz San Miguel y María Isabel Ortiz San Miguel.

[11] Los autos sugieren que existe un gran número de subarrendamientos en la finca. Por ejemplo, un informe pericial de los demandantes, con fecha de octubre de 2004, indica la presencia de tres torres y 119 antenas, a las cuales corresponden setenta permisos activos hallados en los archivos de la Comisión Federal de Comunicaciones. Apéndice, pág. 275.

Estimó dicho foro que la pregunta a dirimir era si EMB incurrió en mala fe durante la renegociación del contrato.[12] Concluyó al respecto que los demandantes no señalaron los hechos constitutivos de mala fe, no hicieron las indagaciones necesarias antes de otorgar la escritura de 1994, ni fueron inducidos a error por EMB. Apoyó su análisis con una estipulación que vale la pena reproducir: "En o antes del 15 de noviembre de 2002 ningún miembro de la Sucesión Ortiz Brunet preguntó a [EMB] si el predio arrendado por éste [sic] había sido subarrendado." Por último, el foro de instancia concluyó que era innecesario descubrir y pasar prueba sobre los cánones subarrendaticios, pues "la norma jurídica que rige el caso de autos permanece inalterada indistintamente del beneficio económico que [EMB] reciba por el subarriendo del predio de marras." Apéndice, págs. 315-323.

El Tribunal de Apelaciones revocó dicha sentencia ante la oportuna apelación de los demandantes. Resolvió, en primer lugar, que existía una clara controversia de hechos y de derecho. Citamos extensamente su explicación:

> Los apelantes...sostienen que, aún cuando no había en el contrato una prohibición de subarrendar, el Mundo, en su deber de actuar de buena fe, debió informar a la Sucesión (los apelantes) de estos subarriendos de manera que ellos hubieren podido estar informados y en una

---

[12] El Tribunal formuló dicha interrogante al concluir que no existía controversia entre las partes sobre la validez del arrendamiento, la ausencia de cláusula alguna que prohibiera el subarrendamiento, ni el cumplimiento de EMB con los términos pactados y las disposiciones del Código Civil sobre el subarrendamiento.

mejor posición para determinar cual (sic) era el canon de arrendamiento más justo y razonable para las partes...

. . . Añaden los apelantes que estamos ante un contrato de larga duración y esto justifica que se tenga la información del monto de los subarrendamientos para determinar si estos guardan proporción con lo que el Mundo les paga.

. . .

Los apelantes están alegando una falta de buena fe de parte del Mundo al omitir información que debió haber provisto cuando se estaba negociando la ratificación y enmiendas del contrato original de arrendamiento, en el año 1994. Información que tampoco puso en conocimiento de éstos al ejercer su opción en el año 2002 [. . .]

Los apelantes están solicitando la intervención del tribunal para que atempere la irracionalidad de la causa por haberse lesionado el principio de la reciprocidad de las prestaciones y la buena fe. Que el tribunal determine si en adición a lo expresamente pactado, la buena fe creó en éste (sic) caso unos deberes especiales de conducta exigibles de acuerdo a la naturaleza de la relación jurídica y la finalidad perseguida entre las partes.

En segundo lugar, el foro *a quo* determinó que no hubo un descubrimiento de prueba adecuado. Específicamente, "el [Tribunal de Primera Instancia] permitió un descubrimiento dirigido y limitado que no permitió a los apelantes descubrir prueba que estaba en controversia o cuya pertinencia se adjudicó desde muy temprano en los procedimientos." Apéndice, págs. 357-375.

EMB instó oportunamente el recurso de epígrafe para que revisáramos el dictamen apelativo.[13] Al cabo de varios

---

[13] La peticionaria señaló los siguientes errores:
Erró el Tribunal de Apelaciones al revocar la sentencia dictada por el Tribunal de Instancia

trámites procesales,[14] expedimos el auto y recibimos la comparecencia de cada parte. Por las razones que se discuten a continuación somos del criterio que la determinación del foro primario era la correcta.

## II.

La buena fe es un principio medular en nuestro derecho de contratos.[15] Sus dictámenes vinculan a las partes durante las relaciones precontractuales, afectan la interpretación de los contratos, regulan su cumplimiento, y permiten su

---

por alegadamente existir controversias de hechos y de derecho.

Erró el Tribunal de Apelaciones al determinar que el Tribunal de Instancia había abusado de su discreción al limitar el descubrimiento de prueba.

[14] Los trámites aludidos incluyen una *Moción Informativa en Torno a Cambio de Nombre de la Peticionaria El Mundo Broadcasting Corporation*. Nos informa el letrado suscribiente los siguientes hechos: la representación legal de la peticionaria fue contratada por la Fundación Ángel Ramos, Inc. ("Fundación"); el 1ro de agosto de 2003, la Fundación vendió a HBC Puerto Rico, Inc. ("HBC") todas las acciones de EMB; luego se fusionaron dichas entidades, sobreviviendo HBC; en la referida compraventa de acciones, la Fundación se comprometió a representar a HBC en todo litigio surgido antes de la compraventa; HBC ha cambiado su nombre a Univisión Radio Puerto Rico, Inc. Dado que estas circunstancias no afectan la adjudicación del recurso ante nos, continuaremos refiriéndonos a la peticionaria como EMB.

[15] Procede una aclaración con respecto al alcance de nuestro análisis. El principio de la buena fe se ha invocado para fundamentar varias figuras obligacionales arraigadas en nuestra tradición civilista, como las de *rebus sic stantibus*, actos propios, y abuso del derecho. Véase: M. J. Godreau Robles, *Lealtad y buena fe contractual*, 58 Rev. Jur. U.P.R. 367 (1989). **Los recurridos no han invocado tales doctrinas ni han alegado los hechos que las harían pertinentes. Su reclamo se ampara en una aplicación directa del principio de la buena fe al proceso de negociación y a las prestaciones.**

modificación.[16]   Véase, J.L. De los Mozos, *El principio de la buena fe, Sus aplicaciones prácticas en el Derecho civil español,* Ed. Bosch, Barcelona, 1965, págs. 179-183, 222-228; J. Mosset Iturraspe, *Interpretación económica de los contratos*, Rubiznol-Culzoni Editores, Buenos Aires, 1994, capt. IV.   La buena fe, es una fuente que produce "especiales deberes de conducta exigibles en cada caso, de acuerdo con la naturaleza de la relación jurídica y con la finalidad perseguida por las partes a través de ella". *Arthur Young & Co. v. Vega III*, supra, a las págs. 170-171; citando a Godreau Robles, *op. cit.*, pág. 379, quien cita a L. Díez-Picazo, *Prólogo, en* Wieacker, *El principio general de la buena fe*, Madrid, Civitas, 1982, pág. 19.

**A.**

El principio de la buena fe vincula a las partes

---

[16] Véase, en general, Godreau Robles, *op. cit.* Con respecto a las relaciones precontractuales, véase: *Colón v. Glamorous Nails & Boutique*, 166 D.P.R. ___, res. 3 de febrero, 2006 T.S.P.R. 16; *RBR Const. v. Autoridad de Carreteras*, 149 D.P.R. 836 (1999); *Torres v. Gracia*, 119 D.P.R. 698 (1987); *Producciones Tommy Muñiz v. COPAN*, 113 D.P.R. 517 (1982).   Véase, con respecto a la interpretación de los contratos: *Municipio de Mayagüez v. Lebrón*, 167 D.P.R. ___, res. 21 de abril, 2006 T.S.P.R. 70; *Ex parte Negrón Rivera y Bonilla*, 120 D.P.R. 61, 75 (1987); *Ramírez, Segal & Látimer v. Rojo Rigual*, 123 D.P.R. 161, 174-175 (1989).   Sobre el cumplimiento, véase: *Arthur Young & Co. v. Vega III*, 136 D.P.R. 157, 170-171 (1994); *Ramírez Anglada v. Club Cala de Palmas*, 123 D.P.R. 339 (1989).   Con respecto a la modificación del contrato, véase: *López de Victoria v. Rodríguez*, 113 D.P.R. 265 (1982) (sentencia), citada con aprobación en *Marcial Burgos v. Tome*, 144 D.P.R. 522, 536 (1997), y *Méndez de Rodríguez v. Morales Molina*, 142 D.P.R. 26, 35 (1996); *Utility Consulting Services v. Municipio de San Juan*, 115 D.P.R. 88 (1984) (sentencia), citada con aprobación en *Levy v. Autoridad de Edificios Públicos*, 135 D.P.R. 382, 395 (1994).

durante la preparación de un contrato. Ejemplo de ello es la doctrina pautada en *Producciones Tommy Muñiz v. COPAN,* 113 D.P.R. 517 (1982), y su progenie sobre la ruptura injustificada del trato precontractual. Véase además, *H.U.C.E. de América v. V & E Engineering Construction*, 115 D.P.R. 711, 716 (1984). Empero, téngase presente que la buena fe precontractual no ha de evaluarse en abstracción de otras figuras jurídicas pertinentes. En *Producciones Tommy Muñiz* expresamos:

> la amplia gama de supuestos sobre los que puede asentarse la responsabilidad precontractual hace necesario que en el análisis del problema se considere qué figura jurídica --culpa, dolo, fraude, buena fe, abuso del derecho u otros principios generales del derecho-- responde más adecuadamente como fundamento jurídico para la solución del caso.

113 D.P.R., a las págs. 529-530.

Uno de los supuestos de mala fe precontractual se configura cuando el silencio de una parte vicia el consentimiento de la otra. Dicho supuesto lo examinamos en *Márquez v. Torres Campos*, 111 D.P.R. 854 (1982). También véase *Bosques Soto v. Echevarría Vargas*, 162 D.P.R. \_\_\_, res. 13 de septiembre, 2004 T.S.P.R. 149 ("constituye dolo el callar sobre una circunstancia importante respecto al objeto del contrato").

El caso de *Márquez* surgió a raíz de una compraventa bovinaria. Márquez venía desarrollando un negocio de crianza de ganado a pequeña escala, durante casi cinco años, y compró 25 novillos a Torres Campos. Éste había sustraído el ganado de un hato bajo cuarentena por

tuberculosis, sin la debida autorización. Márquez desconocía los procedimientos de cuarentena y Torres Campos nunca reveló el problema.[17] Infectadas sus reses y otros animales, Márquez demandó a Torres Campos por los daños derivados de su dolo o negligencia. Al confirmar la sentencia condenatoria, señalamos que el dolo consistió en "callar voluntaria y conscientemente respecto a la condición de contagio del ganado. . . ." Luego explicamos que "la doctrina acepta que el callar sobre una circunstancia tan importante como la aquí presente, constituye dolo." 111 D.P.R., a la pág. 871 y nota 18.

Ubicado el silencio precontractual bajo la figura del dolo, es preciso examinar las circunstancias generalmente constitutivas del mismo. Incurre en dolo quien actúa con la voluntad consciente de producir un acto injusto, es decir, contrario a la honestidad e idóneo para sorprender la buena fe ajena. **Tal figura exige un análisis atento a las circunstancias peculiares de cada caso, entre ellas la educación, experiencia y condición socio-económica de las partes.** *Colón v. Promo Motor Imports*, 144 D.P.R. 659, 666,

---

[17] No está claro, sin embargo, que la condición fuera totalmente inadvertible. Indicamos en nuestra Opinión: "Del 4 al 7 de noviembre se llevó a cabo la primera inspección [de la finca del demandante] por autoridades federales y locales encontrándose una cabeza contagiada. Esta tenía una pantalla de identificación indicativa de que provenía de la finca del demandado y que en una inspección anterior había sido encontrada sana. Pudieron identificar además otras cinco (5) reses provenientes de la finca del demandado a través de sus respectivas pantallas de identificación." *Márquez v. Torres Campo*, 111 D.P.R. 854, 859-860 (1982).

669 (1997).

Puede colegirse que son al menos cuatro los factores relevantes al determinar si procede anular o alterar un contrato debido a que una de las partes conocía y no divulgó determinado hecho. Debemos considerar la importancia objetiva y subjetiva de la información omitida, las posibilidades que tuvo el perjudicado de descubrirla, las características evidentes de ambas partes, así como la naturaleza y finalidad de la relación jurídica entre las partes. En el caso reseñado de *Márquez*, por ejemplo, el perjudicado no era perito, el vicio no era evidente, y éste era muy importante para el perjudicado y para terceros.

Este análisis debe efectuarse reconociendo que entre las partes contratantes ha de existir, necesariamente, intereses contrapuestos y que cada cual, en una economía de libre competencia, lo que interesa es adelantar los suyos. En cuyo caso, la exigencia de no guardar silencio respecto asuntos relacionados a la relación contractual que se procura, debe reconocer cierta libertad de acción propia de los intereses que se contraponen. Por tal razón, la doctrina reconoce "que el ámbito de las tratativas es al mismo tiempo campo de colaboración y de competición. Que la primera es garantía de orden y la segunda alimenta aspectos vitales del sistema. **De ahí que no viole el deber de 'aviso' el contratante que sabiendo que la mercadería a adquirir va a aumentar de precio a la brevedad, no lo comunique a la contraparte en las tratativas.**" (Énfasis

nuestro).  Mosset Iturraspe, *op. cit.*, pág. 206.

La disyuntiva entonces es determinar cuál de los múltiples elementos que influyen sobre el contrato se configura en un criterio de la solidaridad que obliga a su divulgación y cuál o cuáles se constituyen como elementos de la competencia, donde tal deber es inexistente.  Somos del criterio que esencialmente, dónde ubique cada criterio, dependerá de las circunstancias particulares del negocio, de la naturaleza misma del contrato que se celebra, de las personas que contratan, entre otros criterios.  En última instancia, corresponderá al juez evaluar y sopesar los mismos.  En ese proceso, éste deberá auscultar una multiplicidad de circunstancias entre las que destaca **"en que medida pudo el contratante descubrir por sí mismo los aspectos sobre los que no se le dio aviso, empleando el debido cuidado y atención."** (Énfasis nuestro.)  Mosset Iturraspe, *op. cit.*, 207.

**B.**

Las personas de buena fe no exigen el estricto cumplimiento de todas sus acreencias.  De ahí que el artículo 1210 del Código Civil, 31 L.P.R.A. § 3375, faculte a los tribunales para modificar un contrato válido.  *López de Victoria v. Rodríguez*, supra; *Utility Consulting Services v. Municipio de San Juan*, supra; *Levy v. Autoridad de Edificios Públicos*, supra.[18]

---

[18] El concepto "orden público" del artículo 1207 del Código Civil, 31 L.P.R.A. § 3372, también autoriza la modificación

Nuestra *Sentencia* en el caso de *Utility Consulting Services v. Municipio de San Juan*, supra, ilustra la función moderadora que responde directamente el principio de lealtad.[19] Allí se revocó una sentencia que declaraba ha lugar cierta demanda en cobro de dinero y daños contra el Municipio de San Juan. Caracterizamos los hechos pertinentes del siguiente modo:

> Es de alto relieve la desproporción exorbitante entre las prestaciones de las partes contratantes, que conduce al derrumbe del contrato por aniquilamiento del equilibrio de esas mutuas prestaciones. Por una labor simple y esporádica que en ocasiones se reducía a limpiar la ventana de un contador olvidado y descubrir que el ratio (coeficiente) de tarifa era de 700 y no de 7,000 como se venía facturando; por el empleo de tiempo mínimo y horas no especificadas, la recurrida invoca el contrato para justificar su acreencia sobre fondos públicos de $2,749,044.10 generados en su mayor parte durante los tres años siguientes a su intervención.

115 D.P.R., a la pág. 89. Luego indicamos que "la arraigada tradición de la autonomía de la voluntad (*pacta sunt servanda*), eje de la seguridad jurídica, permite frenar su predominio absoluto cuando la excesiva onerosidad alcance dimensiones de mala fe." *Loc. cit.* Enfatizamos, sin embargo, que se debe utilizar dicha facultad con gran cautela y notoria justificación. Uno de los factores a considerarse es si era previsible la excesiva onerosidad.

---

de los contratos cuando resultan leoninos. *De Jesús González v. Autoridad de Carreteras*, 148 D.P.R. 255 (1999). Esta figura no se ha invocado en el caso de autos.
[19] Cabe reiterar que la sentencia aludida fue citada con aprobación en *Levy v. Autoridad de Edificios Públicos*, *supra*, a la pág. 395.

115 D.P.R., a las págs. 89-91.

### III.

Los demandantes-recurridos sostienen que procede la "cancelación" o modificación de un arrendamiento debido a la mala fe de su arrendataria, EMB.  Ofrecen dos razones: (1) EMB no divulgó sus contratos de subarrendamiento durante las negociaciones de 1994; (2) los beneficios económicos que deriva EMB de los referidos contratos son muy superiores al canon arrendaticio.[20]  Dichas alegaciones no justifican los remedios solicitados, dadas las circunstancias de este caso.  Veamos.

### A.

En su primer planteamiento, los recurridos sostienen que EMB incurrió en mala fe al ocultar los subarriendos cuando se negociaron la ratificación y las enmiendas al arrendamiento.  Hacen el planteamiento a pesar de los siguientes hechos relacionadas con la escritura de 1994. **Primero, al menos uno de los arrendadores otorgantes era un abogado, él estuvo a cargo de las negociaciones, y ninguno de los arrendadores preguntó a EMB sobre el uso del terreno.  Segundo, dicha circunstancia era verificable, al**

---

[20] Los recurridos añaden que EMB cumplió sus obligaciones contractuales con mala fe al no revelar los subarriendos. *Demanda*, Apéndice, pág. 31; *Alegato de los Recurridos*, pág. 9.  Es decir, nos invitan a resolver que el principio de lealtad impone sobre el arrendatario un deber de revelar *motu proprio* los subarriendos pactados, al menos cuando el contrato es de larga duración y su canon es muy inferior al beneficio derivado de los subarrendamientos.  Dicha norma carece de fundamento jurídico.

**menos parcialmente, con una inspección de la finca.[21]**

**Tercero, se trata aquí de una transacción comercial: es decir, el propósito de ambas partes era primordialmente lucrativo.[22]**

Así, el argumento de los recurridos se reduce a que la información debió divulgarse debido a su importancia. Ésta responde exclusivamente al plazo del arrendamiento y a que su canon es muy inferior al beneficio derivado de los subarrendamientos. Los recurridos no sostienen que la pérdida de ingresos les haya causado serias dificultades económicas, que terceros se hayan afectado adversamente, etc. Se trata, pues, de un planteamiento esencialmente comercial.

Somos del criterio que la mera desproporción entre ciertas prestaciones futuras es insuficiente para producir un deber de informar los hechos pertinentes durante las

---

[21] Los recurridos arguyen que el uso era descubrible sólo con la intervención de un perito. Rechazamos este planteamiento por dos razones. Primero, una inspección medianamente cuidadosa de la finca hubiera revelado indicios de un uso más intensivo. De hecho, los recurridos alegaron ante el foro primario:

> En marzo y abril del 2004, el Sr. Carlos Ortiz Brunet tomó varias fotografías del terreno arrendado. Estas fotos demuestran varios discos o antenas parabólicas (*dishes*) en el terreno. Estas suman más de media docena [sic].

*Moción sobre Contestación a Descubrimiento de Prueba...*, Apéndice, pág. 198 (escolios omitidos). Segundo, no se ha explicado por qué era imposible o inapropiado contratar a un perito antes de otorgar la escritura de 1994.

[22] Estas consideraciones disponen de la controversia sobre si hubo un vicio del consentimiento debido al error, asunto que no ha figurado centralmente en este litigio, pero que las partes discuten en sus alegatos.

negociaciones, más allá del deber que pueda existir al palio de otras normas obligacionales. Valga enfatizar que esto aplica sólo en situaciones como la presente, es decir, en ausencia de otras consideraciones favorables al deber de informar. Recuérdese que estamos ante un contrato comercial, pactado sin las gestiones que pudieron revelar la información omitida, y cuyo negociante (por la parte perjudicada) era un profesional del derecho.

En fin, no hubo una omisión capaz de justificar la anulación o revisión del contrato ante nos.

### B.

Los recurridos sostienen que se debe moderar la excesiva onerosidad del canon arrendaticio, cuya mera exigencia constituye un acto de mala fe, dado el monto de los subarrendamientos.

Son varias las consideraciones relevantes al determinar qué constituye mala fe respecto una prestación desorbitada. Entre ellas figura si las partes contemplaron o debieron contemplar el desbalance de las prestaciones.[23]

---

[23] También observamos que no se ha establecido una desproporción entre las prestaciones del contrato. Los recurridos enfatizan el beneficio que recibe EMB como subarrendadora. Sin embargo, falta la evidencia tendiente a demostrar que dicho beneficio no responde a las gestiones o características de EMB. Ciertamente, al sostener que EMB debió reveler los subarriendos durante las negociaciones de 1994, los recurridos señalan que "la razón de ser de estos subarriendos es claramente el terreno y la facilidad de retrasmitir señales de radio, televisión y microondas [sic]." Pág. 10. Pero la cuestión medular no se refiere a si el terreno es apto para la retransmisión, sino a factores tales como su aptitud relativa a otros terrenos y

Valga recalcar entonces lo ya dicho, que al menos uno de los arrendadores era abogado cuando se otorgó la escritura de 1994 y estuvo a cargo de las negociaciones; que los arrendadores no indagaron con EMB sobre el uso del terreno durante las negociaciones; y que era posible verificar dicho uso, al menos parcialmente.  Estas circunstancias dificultan, por no decir, imposibilitan, en este caso la modificación judicial del contrato.[24]  Las omisiones de los arrendadores no pueden convertir las acciones de los arrendatarios en unas de mala fe.[25]

---

la capacidad de los recurridos para desarrollar el mismo negocio que ha desarrollado EMB.

[24] El resultado al que llegamos hace innecesario examinar el segundo señalamiento de error que hace la peticionaria, sobre la suficiencia del descubrimiento de prueba.

[25] Al cerrar entendemos necesario los siguientes comentarios para atender algunas de las expresiones de la Opinión de conformidad ya que entendemos que las mismas no logran apurar la posición expresada en nuestra Opinión disidente. En ésta se sostiene, únicamente, que cuando una parte alegue disparidad en unas prestaciones --que es lo que aquí se plantea-- no es necesario saber cuál es la disparidad si la parte que lo alega no demostró su diligencia.  Ello, matizado por y visto en el contexto de, un negocio como el de autos donde, la parte "afectada" que gestionó el contrato fue un reconocido abogado, las características de la propiedad eran de fácil corroboración, no se hizo gestión alguna para inquirir sobre el predio y su posible subarrendamiento y, claro está, nada en el contrato prohibía el subarrendamiento.

De otra parte, se debe aclarar también que dado la etapa procesal en que se encuentra este caso, no se está en posición de determinar y por lo tanto concluir fehacientemente, que estamos ante una gestión de negocios deshonesta.

**IV.**

En virtud de lo antes expresado, somos del criterio que procedía, como cuestión de derecho, dictar sentencia revocando la *Resolución* recurrida y en su consecuencia desestimar la demanda instada.


                                        Anabelle Rodríguez Rodríguez
                                                Juez Asociada